FOURTH DIVISION
November 29, 2007

No. 1-05-3911

| | | |
|---|---|---|
| HECTOR ADAMES, JR., and ROSALIA DIAZ, as Co-Special Administrators of the Estate of Joshua Adames, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 01 L 05894 |
| v. | ) | |
| | ) | |
| MICHAEL F. SHEAHAN, in his Official Capacity as Cook County Sheriff, BERETTA U.S.A. CORPORATION, and FABBRICA D'ARMI PIETRO BERETTA S.P.A., | ) ) ) ) | Honorable Carol Pearce McCarthy, Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

MODIFIED UPON DENIAL OF REHEARING

JUSTICE MURPHY delivered the opinion of the court:

On May 5, 2001, Joshua Adames (Josh) was shot in the abdomen while playing with William Swan (Billy). Billy's father, David Swan (David), was employed by the Cook County sheriff's department at the time. Billy, age 13, had found David's service weapon in his parents' bedroom closet and was playing with it when Josh came over. While playing, Billy accidentally shot Josh in the stomach and he died as a result of the abdominal wound.

Plaintiffs, Hector Adames, Jr., and Rosalia Diaz, co-special administrators of the estate of Joshua Adames, brought suit against various defendants. At issue on appeal are plaintiffs' claims against defendant Cook County Sheriff Michael F. Sheahan (Sheahan) and defendant Beretta U.S.A. Corp. (Beretta). Following the conclusion of discovery, the trial court granted

defendants' separate motions for summary judgment. Plaintiffs now appeal the trial court's orders granting defendants' motions for summary judgment. For the following reasons, we affirm in part and reverse in part the findings of the trial court and remand this matter for a new trial.

## I. BACKGROUND

### A. Billy Swan

On the morning of Sunday, May 5, 2001, Billy was home alone while his mother was at work and David and his brother went out. Billy called Josh and invited him over to play. Billy went into his parents' bedroom to watch through their window for Josh's arrival. Billy knew that inviting Josh over and going into his parents' bedroom were both against the rules.

Billy noticed that his parents' closet door was open and he saw a box on a shelf. Billy retrieved the box, which was unlocked and contained three guns belonging to David, including a Beretta 92 Series handgun (handgun) with a full magazine clip of bullets. Billy never saw his father carry or clean a gun in the house, but thought that his father might have a gun.

Billy had never handled a gun before, but he picked up the handgun and pushed a button that released the magazine holding the bullets. Billy replaced the clip and removed it several times. He also moved the slide mechanism at the top of the handgun and a bullet popped out. Billy repeatedly removed and replaced the bullets and magazine from the handgun. Billy stated that he understood the handgun to be loaded when the magazine was in place. However, he thought that bullets came out of the top of the magazine when the handgun was fired, not from within the chamber of the handgun. Billy also thought that removing the magazine fully unloaded the handgun.

After a few minutes, Billy saw his friend, Michael, riding his bicycle outside. Billy took

the three guns, put them in his pockets and went downstairs to see Michael. Billy showed

Michael the guns and how they worked. Josh arrived and Michael went to another room in

Billy's house.

Billy and Josh began wrestling and playing around. Billy showed Josh the handgun,

ejecting the magazine and bullets as described above. Billy removed the magazine and the bullet

using the slide on the handgun, placing the bullets and magazine in his pocket. Billy first

pretended to fire the handgun six or seven times at Josh before he actually pulled the trigger.

Billy knew the handgun was dangerous and it could hurt or kill somebody, but he thought that the

magazine had to be loaded in the handgun to fire a bullet. Tragically, the handgun discharged a

chambered bullet that hit Josh in the abdomen.

Billy ran upstairs and put the guns back in his parents' closet. Billy then ran back

downstairs and realized that he had shot Josh. He called 911 and told the dispatcher that he found

a gun and accidentally shot his friend while playing. Billy also stated that he did not know there

were any bullets in the handgun.

Billy was subsequently found delinquent in juvenile court proceedings relating to the

shooting. The delinquency holding was based on a finding that Billy committed involuntary

manslaughter and reckless discharge of a firearm. Billy was placed on probation. This court

affirmed the delinquency finding of the juvenile court. *In re W.S.*, No. 1-02-1170 (2003)

(unpublished order under Supreme Court Rule 23).

## B. David Swan

David testified that he graduated from the police academy in 1988, was deputized with the

Cook County sheriff around January 1988, and promoted to lieutenant in 1997 or 1998. David

carried a gun with him to work as an officer. When David started with the sheriff's office, his

service revolver was a Smith & Wesson .38 Special. Eventually, he became certified in automatic weaponry and the handgun became his service handgun. David was promoted to supervisor and no longer needed his handgun on the job and, therefore, rarely brought it to work. David continued as a supervisor after the incident, even though all of his firearms were confiscated by the police investigators.

David testified that he owned three guns: the handgun, the .38 Special, and a .25 automatic. All three guns were stored in the same locking case, along with ammunition. David stored the case, and additional ammunition, on the top shelf in his closet. He maintained one key to the case on his key ring and an additional key in the junk drawer of his dresser. Approximately a year before the shooting, David completed his annual firearm qualification. David disagreed with Billy's testimony and stated that he locked up all three guns in the lockbox, returned them to the top shelf in his closet and did not touch the guns after that date. For the purposes of defendants' summary judgment motions and these proceedings, the presumption is that the lockbox was unlocked.

David understood that the sheriff's office required deputies to secure and store their weapons in either a locking box, like he used, or with a trigger lock. David testified that, pursuant to department requirements, he stored the ammunition separately from the handgun and that the handgun was stored without a bullet in its chamber. David knew how to check if a bullet was in the chamber and how to clear the weapon. David also knew about trigger locks, but did not have one and did not look into purchasing one for his handgun. However, David was not aware that the handgun would fire a bullet with the magazine removed. David also was unaware of a settlement by Beretta in a different case that included an agreement to include either magazine disconnect safeties in all guns sold after January 1, 2001, or a warning label that the

firearm is capable of firing when the magazine is not engaged.

David stated that his house rules included a prohibition on any child in the parents' bedroom at any time and no one outside the family was allowed in the house when he or his wife was not home. David testified that he reminded Billy of this rule on May 5, 2001, and Billy told him that he was going to go to the park. David speculated that Billy found the lockbox and the key and gained access to the gun. However, from the moment he returned to the house after the shooting to the day of his deposition, Billy had never openly discussed the shooting. David admitted that he never informed his children that he maintained guns in the household and that he never taught them gun safety.

In response to the shooting, Sheahan filed a complaint against David before the Merit Board claiming that David failed to properly secure and store his handgun. David's guns were taken from him by the police in their investigation and never returned to him. Following a bench trial, David was found not guilty of criminal charges based on the proscription under section 24-9 of the Criminal Code of 1961 (720 ILCS 5/24-9 (West 2004)) against improper storage of a firearm in a premise in which a minor under 14 is likely to gain access to the firearm.

### C. Sheriff's Office Rules and Policies

Sheahan's general counsel, executive director, and weapons training officers testified to the department's rules and procedures and training programs. At the time of the incident, Sheahan had a general order in place that mirrored or exceeded the requirements of section 24-9 of the Criminal Code of 1961. 720 ILCS 5/24-9 (West 2004). The purpose of the general order is to promote safe gun usage, citing 1,134 Americans were killed in 1997 from accidental shootings and that, annually, about 300 children are killed in accidental shootings. The general order requires officers to secure duty weapons in a secured lock box container or other location

that would prohibit access by unauthorized persons to avoid accidents.  In addition, officers are required to store any keys to such locking devices in a secure location separate from the weapon. Officers were taught to expect children to look everywhere in their homes.  Therefore, weapons must always be inaccessible to children and properly stored to avoid accidents with children.

Sheahan's training program also included materials on educating family members, particularly children.  Education of children was detailed as an additional responsibility beyond proper storage.  Specifically included in the materials is the recommendation to openly discuss firearm safety with children and avoid ignoring the issue.

Officers are informed that their responsibility for their firearm includes unintentional discharge because of improper storage, education, or disarming of the firearm.  Officers were re-certified in their firearms annually, which included a program on home firearm safety.   Although David did not need a weapon to perform his duties as a supervisor, he completed this program annually.

### D.  The Handgun

Extensive testimony and documentation was presented regarding the handgun itself and various safety measures available in the industry.  The handgun is a semiautomatic pistol designed for law enforcement and military use.  The handgun is loaded by filling the magazine with bullets and inserting the filled magazine into the magazine well.  The handgun is prepared for discharge by chambering the first round, pulling the slide to the rear of the handgun, and releasing it.  When the safety is off, the handgun may be fired by its double-action trigger pull.  After the chambered round is fired, the slide recoils to the rear, the spent cartridge is ejected, and the next live round is chambered upon the return of the slide.

This process will continue each time the trigger is pulled until the magazine is empty, at which time the slide remains locked open until the slide catch lever is released. Therefore, the user knows when firing the handgun that the magazine and chamber have been emptied. A user may also check if a round has been chambered by manually pulling the slide back and visually determining if a round has been loaded. Additionally, the handgun has a chamber loaded indicator – a small extractor head painted red – that protrudes from the side of the slide when the chamber is loaded. Other safety devices on the weapon include: an ambidextrous safety-decocking lever; a hammer drop catch; a flared and serrated trigger guard; an automatic firing pin catch; a two-piece inertial firing pin unit; a reversible magazine release button; and a slide overtravel stop. Beretta did not include a magazine disconnect safety on this model.

Each handgun sold by Beretta was packaged with an instruction manual that included specific warnings and safety instructions. Like the training provided by Sheahan, the instruction manual contains repeated warnings of the dangers of firearms and the importance of proper handling and storage to avoid accidental injury or death. In particular, it contains advice to owners to store guns in locked storage units out of reach of children with ammunition stored separately.

Further, the manual contains advice to owners to make sure the cartridge chamber is empty when storing the handgun. Explicit step-by-step instructions on how to safely and completely unload the handgun are provided. The manual also includes instructions on how to fully engage the safety, release the magazine, fully retract the slide to extract and eject the chambered cartridge, and, finally, visually inspect the open slide and magazine well to ensure all cartridges have been completely ejected. This information is repeated several times in the manual.

### E. Expert Testimony

Plaintiffs presented witnesses who opined that the gun as designed was unreasonably dangerous. Plaintiffs' expert, Stanton Berg, a firearms consultant, admitted that an accident-proof handgun is impossible, but claimed that repetitive accidents may be designed out by gun manufacturers. Berg opined that if the handgun had a magazine disconnect safety, a device that stops the firearm from firing when the magazine is not fully inserted, the shooting in this case would not have occurred. Berg noted that this safety device was invented in 1910 and had even been used by Beretta on 92 Series handguns utilized by some police departments. Berg listed over 300 models of handguns that utilize a magazine disconnect safety and concluded that a handgun without such a safety is defective.

Berg continued to opine that the chamber loaded indicator located on the side of the slide was insufficient. He claimed the indicator was too small to provide an effective warning that a bullet was chambered. Berg also testified that the handgun should contain a warning on the firearm itself that it could be fired with the magazine removed. Berg admitted on cross-examination that the nature and function of a firearm is to discharge a projectile at a high rate of speed. Berg stated that the majority of law enforcement agencies in the country utilized firearms without a magazine disconnect safety. Berg also admitted that it was a valid concern of these agencies to assure that they utilize firearms without anything that threatened to be an impingement on the firing of the gun.

Wallace Collins, a firearms and ammunition design and safety expert, testified to his study of safety assists suitable for handguns. Collins determined that the following safety characteristics were available at the time the handgun was manufactured, but were not included: a magazine

disconnect safety; a warning that the gun will fire when the magazine is released; a better-located chamber-loaded indicator with clear directions; and a key lock. Therefore, Collins concluded that the handgun was unnecessarily dangerous.

Collins testified that these safety features were readily available, inexpensive, and commercially feasible. Collins opined that the key safety component that was missing was the magazine disconnect safety. Collins concluded that countless accidents like the shooting in this case could be avoided by the implementation of the devices.

Stephen Teret, a professor of epidemiology for the School of Public Health at Johns Hopkins University, also was deposed as a witness for plaintiffs. Teret prepared a report on the shooting and testified that he concluded that the absence of a magazine disconnect safety caused the shooting in this case. Teret included data in his report from a survey designed by the Johns Hopkins Center for Gun Policy and Research, performed by the National Opinion Research Center and reported in the Journal of Public Health Policy. The survey asked respondents whether they thought that a pistol can still be shot when its magazine is removed. Of the 1,200 respondents: 65% answered the pistol could still be fired; 20.3% answered the pistol could not be fired; 14.5% did not know; and .2% refused to answer. Of the 34.8% who responded that the pistol could not fire when the magazine is removed or that they did not know, 28% lived in a gun-owning household. Teret also testified that he felt the chamber loaded warning was not effective and could not possibly warn people who have no knowledge about guns.

Witnesses for Beretta testified that they understood that children gain access to guns and accidental shootings have occurred both with and without the magazine inserted in the gun. It was agreed that this incident would not have occurred with a magazine disconnect safety installed

on the handgun. It was further admitted that Beretta was capable of manufacturing guns with such a feature at a cost of up to $10 per gun. However, Beretta did not include a magazine disconnect because there was no market demand for that feature. Beretta also admitted to other manufacturers' use of the aforementioned safety devices on their handguns.

Beretta introduced evidence that the Beretta FS is utilized by police departments throughout the country. Testimony was presented that the handgun, as manufactured, met or exceeded industry standards. Further testimony on behalf of Beretta claimed that for the past 20 years, the vast majority of law enforcement agencies have consistently expressed a preference for no magazine disconnect safety or internal locking devices. Law enforcement officers and agencies do not want weaponry that may become inoperable by an inadvertent release of the magazine, that could possibly jeopardize the safety of officers and the public.

### F. Motions for Summary Judgment

Both defendants filed motions for summary judgment. The trial court granted the motions in separate orders dated August 23, 2005. With respect to Sheahan, the trial court found that questions of material fact remained to preclude summary judgment on plaintiffs' arguments regarding the propriety of weapon storage and scope of employment. However, summary judgment was granted based on the trial court's finding that Sheahan did not have a duty to protect the victim from the criminal acts of Billy Swan. The trial court also noted that, had a duty existed, the cause of the harm was not reasonably foreseeable.

Beretta argued in its motion for summary judgment that its product was not unreasonably dangerous, it had no duty to warn due to the obvious danger, and that Billy Swan's actions were an intervening cause. Beretta's motion was granted in its entirety. Plaintiffs timely filed their

1-05-3911

appeal of these two rulings.

## II. ANALYSIS

Summary judgment may be granted when "the pleadings, depositions, and admissions on file, [and] affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2004). The sole function of the trial court is to determine if material issues of fact exist; it is not to try the issues. *Kim v. Citigroup, Inc.*, 368 Ill. App. 3d 298, 305 (2006). We review an order granting summary judgment *de novo*. *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349 (1998). While we also review the evidence in a light most favorable to the nonmovant, we cannot ignore evidence unfavorable to the nonmovant and may sustain the trial court on any basis called for in the record. *Ruane v. Amore*, 287 Ill. App. 3d 465, 474 (1997).

Plaintiffs assert five issues on appeal. With respect to Sheahan, plaintiffs argue that the trial court erred in finding that Sheahan had no duty to Josh and that Billy Swan's conduct was criminal and an independent intervening cause. As to the claims against Beretta, plaintiffs argue that the trial court erred in: failing to find that the handgun was unreasonably dangerous from failure to include a magazine disconnect or a sufficient chamber loaded indicator; failing to find that the handgun was unreasonably dangerous for failing to adequately warn the user; and, as with Sheahan, finding that Billy Swan's conduct was an independent intervening cause superceding Beretta's legal responsibility. However, Beretta asserts in its response and sur-reply that the United States Congress's enactment of the Protection of Lawful Commerce in Arms Act (PLCAA) (Pub. L. 109--12, 119 Stat. 2095 (2005)) (adding 15 U.S.C. § 7901 through 7903) provides gun manufacturers immunity from claims such as those advanced by plaintiffs.

-11-

A. Scope of Sheahan's Duty to Third Parties

Plaintiffs first argue that the trial court erroneously determined that Sheahan had no duty to protect Josh from a criminal attack. While the question of duty is a question of law to be determined by the trial court, plaintiffs maintain that because of the trial court's reliance on the criminal attack, it failed to examine the proper factors to determine whether a party owes a duty to another. Plaintiffs argue that they established the factors relevant to the establishment of a duty, namely: reasonable foreseeability of the injury; the likelihood of injury; the magnitude of the burden to guard against such an injury; and the consequences of placing that burden on the defendant. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140-41 (1990). Therefore, plaintiffs argue that the finding of the trial court must be reversed.

Plaintiffs argue that Sheahan owed a duty to Josh. Plaintiffs cite the rules and training materials created by the sheriff's department requiring safe and secure storage of handguns by officers. In addition, plaintiffs argue that under common law and section 24-9 of the Criminal Code of 1961 (720 ILCS 5/24-9 (West 2004)), Sheahan has a duty to assure his deputies safely secure their service firearms away from children. Furthermore, plaintiffs note that in *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41 (1998), which is taught to deputies during weapons training, this court found the defendant city liable for one of its police officer's failure to properly store his firearm.

In *Gaffney*, a police officer for the City of Chicago stored his unloaded service revolver and bullets together in an unlocked metal cabinet in his home. The officer's minor son took the unsecured revolver and bullets to a party and shot and killed a boy. The minor shooter was subsequently adjudicated delinquent for the shooting. *Gaffney*, 302 Ill. App. 3d at 44. This court

reversed the trial court's grant of judgment notwithstanding the verdict to the City and found that the officer was acting within the scope of his employment at the time he stored his revolver. *Gaffney*, 302 Ill. App. 3d at 43-44. Although the police department had no rules, general orders, or directives requiring officers to lock up guns at home, this court found that the officer was acting within the scope of his employment when storing his revolver at home. This court specifically cited to the police department's training and disciplining officers for off-duty weapon storage issues, testimony that the officer was required to perform authorized tasks whenever the need arose, and the officer's testimony that he stored the revolver unlocked to assure he could carry out his duties on a moments notice. This evidence supported the conclusion that a triable issue of fact remained that he was acting within the scope of employment in storing his revolver. *Gaffney*, 302 Ill. App. 3d at 48-49. Plaintiffs highlight testimony of Sheahan's range master that *Gaffney* is taught because it establishes liability against an officer and the department if an unauthorized person gains access to an improperly stored handgun.

Plaintiffs also assert that the trial court erred in finding that a criminal attack even occurred. Plaintiffs note that Billy testified that the shooting was an accident and that defendants' experts agreed as much. Therefore, plaintiffs claim that since the shooting was unintentional, it was not a criminal attack and did not support the trial court's judgment. Plaintiffs argue that this case involved an accident by someone who clearly did not actively intend the outcome. Plaintiffs assert that even if one is found guilty of reckless or negligent conduct, he may still seek contribution from a negligent third party if he has not committed an intentional tort. Therefore, they conclude that they should not be barred from seeking compensation for Billy's negligence. See *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267 (1994).

Furthermore, plaintiffs argue that the trial court relied upon an unpublished order entered pursuant to Supreme Court Rule 23. Plaintiffs note that the trial court's only reference to evidence of the juvenile proceeding against Billy was to the Rule 23 order and no other evidence is of record. Plaintiffs assert that the Rule 23 order has no precedential value and cannot be utilized for this purpose. *Price v. Hickory Point Bank & Trust*, 362 Ill. App. 3d 1211, 1221 (2006). Therefore, plaintiffs claim the trial court had no support for its finding.

Sheahan responds that a party does not have a duty to protect another from criminal attack absent a special relationship unless it voluntarily undertakes actions to protect that person. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 215-16 (1988). Special relationships that have been found to create a duty are: common carrier and passenger; innkeeper and guest; business inviter and invitee; and voluntary custodian and protectee. *Hernandez v. Rapid Bus Co.*, 267 Ill. App. 3d 519, 524 (1994). Sheahan concludes that no special relationship existed with Josh and that he did not perform any voluntary undertaking to create a duty to protect Josh. Sheahan argues that the recent trend in cases has identified a fear of the expansion of liability and the special relationship rule. See *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351 (2004); *Young v. Bryco Arms*, 213 Ill. 2d 433 (2004); *Charleston v. Larson*, 297 Ill. App. 3d 540 (1998).

Sheahan notes that, though the Rule 23 order affirming the delinquency adjudication was not included in the record, the trial court cited to the order. Sheahan adds that this court may take judicial notice of its own opinions and attached the order to his brief for that purpose. *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003). Contrary to plaintiffs' assertion, Sheahan argues that the Rule 23 order has a preclusive effect to the extent that it affirmed Billy's adjudication and that it was not utilized as precedent based on its legal analysis. Furthermore,

Sheahan argues that the information is of record as David testified to the findings of the juvenile court against Billy. As to the actual crime committed, Sheahan points out that specific intent is not required for involuntary manslaughter and Billy's reckless behavior does not remove the criminality of that conduct.

Sheahan continues that a duty may not be established by internal rules and policies. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 238 (1996). Sheahan argues that the training and general orders with respect to gun safety may establish a standard of care applicable to his officers, but do not establish a duty. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 295 (2000). Sheahan distinguishes *Gaffney* on this subject, asserting that the *Gaffney* court did not examine the question of duty. Sheahan notes that the issue in *Gaffney* was whether the defendant police officer was acting within the scope of his employment when he stored his gun at home. *Gaffney*, 302 Ill. App. 3d at 48-49. In addition, Sheahan asserts that there was no criminal conviction of the child who accessed the gun in that case.

Sheahan concludes that, most importantly, the shooting was not foreseeable and, therefore, no duty could exist. Sheahan maintains that David could not reasonably foresee that Billy would: break his rules against children in the bedroom; find the gun box; unload the gun box; load and unload the gun; and finally shoot Josh. Sheahan argues that this lack of foreseeability takes this case out of the firearms storage statute and no duty existed as a matter of law.

As noted above, the trial court denied the motion to dismiss on the scope of employment issue because an issue of fact remained, but granted the motion on the duty issue. Therefore, Sheahan maintains that this is not a scope of employment case. However, plaintiff sought damages against Sheahan based on the principle of *respondeat superior*. A discussion of the

relevant principles of *respondeat superior* should illuminate and resolve this issue.

"The general rule is that a person injured by the negligence of another must seek his or her remedy from the person who caused the injury. The relation of employer and employee is an exception to this general rule. *Darner v. Colby*, 375 Ill. 558, 560 (1941); *Metzler v. Layton*, 373 Ill. 88, 91 (1939). Under the theory of *respondeat superior*, an employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment. *Wright v. City of Danville*, 174 Ill. 2d 391, 405 (1996); *Pyne v. Witmer*, 129 Ill. 2d 351, 359 (1989). Indeed, the employer's vicarious liability extends to the negligent, willful, malicious, or even criminal acts of its employees when such acts are committed within the scope of the employment. See *Mitchell v. Norman James Construction Co.*, 291 Ill. App. 3d 927, 932 (1997); *Randi F. v. High Ridge YMCA*, 170 Ill. App. 3d 962, 964 (1988); *Webb v. Jewel Cos.*, 137 Ill. App. 3d 1004, 1006 (1985).

The term 'scope of employment,' used interchangeably with 'in the course of the employment,' refers to a 'bare formula,' whose 'very vagueness has been of value in permitting a desirable degree of flexibility in decisions.' W. Keeton, Prosser & Keeton on Torts §70, at 502 (5th ed. 1984). The Second Restatement of Agency has identified three general criteria in determining whether an employee's acts are within the scope of employment.

'(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master ***[.]

***

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master. (Restatement (Second) of Agency §228 (1958).) *Pyne*, 129 Ill. 2d at 360.' " *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163-64 (2007).

"Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff." *Woods v. Cole*, 181 Ill. 2d 512, 517 (1998). This is so even though "[o]nly the agent is at fault in fact for the plaintiff's injuries." *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 154 Ill. 2d 347, 354 (1992).

Both before the trial court and this court, Sheahan strenuously argues that David violated sheriff's department regulations and numerous directives of staff members of the sheriff's department when he failed to put the handgun in a secure locked box. However, it is a well-settled legal principle that where an agent does an act in the course of his employment, although the principle did not authorize or participate in, or know of the conduct, or even if he forbade the

acts or disapproved of them, the rule of *respondeat superior* applies. *Lynch v. Board of Education of Colinsville Community Unit District No. 10*, 82 Ill. 2d 415, 424-25 (1980).

Our supreme court most recently addressed the rule of *respondeat superior* in *Bagent*. There, the court held that "all three criteria of section 228 of the Second Restatement of Agency must be met to conclude that an employee was acting within the scope of employment." *Bagent*, 224 Ill. 2d at 165. The court further held that whether an employee was acting within the scope of employment depends on "the employment contract and the nature of the relationship, which must exist at the time of and in respect to the particular facts out of which the injury arose." *Bagent*, 224 Ill. 2d at 165. Section 229 sets out a nonexhaustive list of several factual matters to consider in determining whether the complained-of act is so similar or incidental to employer-authorized conduct:

> "Pertinent matters include: whether the act is one commonly done by such employees; the time, place, and purpose of the act; the previous relations between the employer and the employee; whether the act is outside the enterprise of the employer or, if within the enterprise, has not been entrusted to any employee; whether the employer has reason to expect that such an act will be done; the similarity in quality of the act done to the act authorized; whether the employer furnished to the employee the instrumentality by which the harm is done; and the extent of departure from the normal method of accomplishing an authorized result." *Bagent*, 224 Ill. 2d at 166-67, citing Restatement (Second) of Agency §229(2) (1958).

An employer's warning to an employee to act with care does not remove an employer

from vicarious liability. Although an express prohibition may argue against an act being within the scope of employment, it is only a factor in determining the issue. *Bagent*, 224 Ill. 2d at 167-68. It is the plaintiff's burden to show the contemporaneous relationship between the tortious act and the scope of employment. *Bagent*, 224 Ill. 2d at 165. However, for purposes of summary judgment, it must be shown that no reasonable person could conclude from the evidence that an employee was acting within the scope of employment. *Bagent*, 224 Ill. 2d at 165.

We find that the facts of this case are similar to those presented in *Gaffney* and that case is controlling. The *Gaffney* court considered the aforementioned factors from sections 228 and 229 of the Restatement. *Gaffney*, 302 Ill. App. 3d at 51-52. As in this case, Sheahan would be hard-pressed to say that officers did not store their weapons at home; in fact, like in *Gaffney*, the specific training and materials on proper storage supports a finding that the act is incidental to an act David was hired to perform. While David did not carry his weapon to work daily like the defendant police officer in *Gaffney*, and he did not testify that he stored his gun unlocked to respond to any emergency in his presence, he did testify that he owned the firearm because of his job and annually was certified to use the firearm as required by Sheahan. David's continued storage of the gun was not outside the enterprise of his employer and David maintainted the firearm for the purpose of serving as a deputy sheriff. As in *Gaffney*, the evidence that Sheahan further disciplined officers for improper storage supports the conclusion that such storage is incidental to employment. This also argues to the factor that the improper storage was not an act that the servant was unlikely to do.

These facts also support a finding that David was acting within the authorized time and space limits of his employment. In addition to the above, testimony was presented that there were

insufficient storage options at the department and home storage was expected. While David testified that he did not carry his firearm to work for his daily duties, the fact remains that he did at one time, he owned the firearm for work purposes, he would be required to use it in an emergency, he was certified annually to use the firearm, and he ultimately was disciplined by Sheahan for his improper storage. While the facts of this case do not present the same explicit testimony from *Gaffney* about an officer's being "on duty" 24 hours a day, these facts argue in favor of finding David was acting within the scope of employment and Sheahan is liable for David's alleged tortious actions.

Accordingly, we must determine whether the trial court erred in finding Billy's actions foreclosed a duty to the victim. First, we note that neither side discussed the importance of the fact that Billy's adjudication of delinquency was conducted, naturally, pursuant to the Juvenile Court Act of 1987. 705 ILCS 405/1-1 *et seq.* (West 2004). Although both the trial court and Sheahan repeatedly raise the import of Billy's "conviction" for criminal acts, our supreme court recently rejected this categorization. *People v. Taylor*, 221 Ill. 2d 157, 163-71 (2006). The *Taylor* court highlighted the Juvenile Court Act procedures both before and after its major amendments in 1999 and found that a juvenile adjudication has never been a "conviction" as defined under the Criminal Code of 1961. 720 ILCS 5/2-5 (West 2004).

Under the Criminal Code, a conviction requires either a plea of guilty or a verdict entered by a jury or court of competent jurisdiction authorized to try the case without a jury. 720 ILCS 5/2-5 (West 2004). Although a juvenile may plead guilty under section 5-605 of the amended Juvenile Court Act (705 ILCS 405/5-605 (West 1998)), minors do not have a right to a jury trial under that act within the meaning of the sixth amendment. *Taylor*, 221 Ill. 2d at 168. In fact,

delinquency proceedings are not criminal, but civil in nature, intended to correct and rehabilitate, not punish. *In re R.G.*, 283 Ill. App. 3d 183, 186 (1996). Further, under the Juvenile Court Act, the State may move to permit prosecution of the juvenile under the criminal laws if the alleged offense is of such a serious nature. 705 ILCS 405/5-805(3) (West 2004). Therefore, a juvenile adjudication is not tantamount to a criminal conviction. *Taylor*, 221 Ill. 2d at 170.

We also note that in civil cases, Illinois courts have similarly differentiated between criminal behavior by an adult and a minor in discussing public policy. In the context of an insurance coverage dispute and application of the inferred-intent standard, this court affirmed that public policy in Illinois favors affording compensation to victims. *Country Mutual Insurance Co. v. Hagan*, 298 Ill. App. 3d 495 (1998). The *Hagan* court likened exclusionary provisions in insurance policies to negligence cases where specific intent to injure requires an ability to foresee the consequences of an act. The court refused to infer that a 14-year-old minor insured had the capacity to form the intent to sexually abuse a 6-year-old was a question for the trier of fact. *Hagan*, 298 Ill. App. 3d at 505. The court concluded that holding perpetrators responsible for actions they intend but of which they have little understanding of the ramifications, would have little deterrent effect and would be far outweighed by the policy in favor of compensating victims. *Hagan*, 298 Ill. App. 3d at 505.

Accordingly, Billy was not convicted of a crime. Sheahan correctly notes that *Gaffney* did not involve a criminal conviction of the minor that accessed his father's gun. Indeed, similar to this case, *Gaffney* involved a juvenile court delinquency adjudication of the minor. Although *Gaffney* did not include an analysis of the import of the minor's adjudication, it is not distinguishable on this point as Sheahan maintains.

The question that remains is whether *Taylor* impacts the trial court's, and Sheahan's, reliance on the adjudication to foreclose a duty. Although plaintiffs' argument that Billy's lack of intent eliminates the criminality required to overcome duty is misguided, the element of intent does take on more importance when viewed in light of *Taylor*. Plaintiffs argue that Billy did not intend to hurt Josh; therefore, there was no criminal attack, but merely an accident. As such, plaintiffs conclude that there was no intervening criminal attack to foreclose a duty to the victim. This reasoning is in line with that of the *Hagan* court.

The determination of duty is a question of law, that question may only be answered upon review of the factual circumstances of the particular case. *Hernandez*, 267 Ill. App. 3d at 522. Taking a view of plaintiffs' presentation of facts under a favorable view, we find that this incident was reasonably foreseeable. Whether Billy's actions were accidental or reckless is a question of material fact that remains for the trier of fact to determine.

Plaintiffs assert that they did not cite to Sheahan's rules and orders to establish a duty, but to show that an incident like the instant situation was eminently foreseeable. Plaintiffs argue that Sheahan's repeated warnings to lock firearms and store ammunition separately and citing to *Gaffney* to underscore the importance of doing so in a place away from children clearly indicate this case was foreseeable. Under plaintiffs' theory, David stored the handgun next to ammunition in an unlocked storage case in an unlocked closet where a 13-year-old boy could easily access such an item of natural "magnetic" intrigue. These particular facts, coupled with the evidence of an acute awareness by Sheahan of these types of incidents, section 24-9 of the Criminal Code, titled "Firearms; Child Protection" (720 ILCS 5/24-9 (West 2004)), and data that this exact scenario plays out across the country every year, indicate the accident was foreseeable for the

purposes of summary judgment.

As noted above, the trial court found that no duty existed because of the lack of foreseeability of a criminal attack and the lack of special relationship. Aside from a citation to *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351 (2004) and our supreme court's specific reluctance to expand duty where it would impose potentially limitless liability for the acts of another, the trial court did not discuss the additional duty factors of the likelihood of injury, the magnitude of the burden to guard against the injury or the consequences of imposing that burden. While under *Ruane* this court may affirm the trial court on any basis in the record, the record in this case does not support an argument that such a duty would be so onerous.

Sheahan argues that even if this shooting was foreseeable, the other factors required to establish duty have not been met. Most importantly, Sheahan asserts that the magnitude and burden of guarding against this type of injury is too high to create a duty. Sheahan maintains that rigorous training is undertaken in teaching gun safety and proper gun storage and to require more of the department would be tantamount to "tucking them in bed" and be unduly burdensome. In conclusion, he argues that establishing a duty in this scenario would open the door to ruinous liability claims against the county anytime an officer's gun is misappropriated and used for harm.

We reject Sheahan's argument that no duty exists based on these additional factors. First, as noted above, Sheahan is vicariously liable under the principle of *respondeat superior* for the torts of his employees when committed within the scope of employment. Second, the likelihood of injury follows the foreseeability discussion above. The record is replete with testimony and evidence that this type of accident is all too common and foreseeable. Our legislature has seen fit to protect children by codifying safe gun storage practices in a statute section entitled "Firearms;

Child Protection." 720 ILCS 5/24-9 (West 2004). Sheahan notes that *Gaffney* involved a scope of employment issue and not a consideration of duty. While *Gaffney* did not include a duty analysis, it ostensibly involved a finding that the defendant city had a duty to protect children from the negligent actions of its police officers. This situation is distinguishable from a resultant crime spree with a stolen gun; it is exactly the scenario the legislature and law enforcement have foreseen and tried to limit. The public interest in protecting children from this harm simply outweighs the burden of assuring police officers properly store their weapons. David's storage of his firearm was incidental to his conduct authorized by Sheahan and summary judgment was improper on this issue.

### B. Proximate Cause and Independent Intervening Cause

Plaintiffs next argue that Billy's actions were not an independent intervening cause that superseded Sheahan's negligence or Beretta's legal responsibility. Plaintiffs assert that they satisfied the foreseeability criterion, both cause in fact and legal cause, to establish a duty and determine proximate cause. Based on the argument above, plaintiffs claim that Billy's actions were foreseeable and summary judgment was improper.

To establish proximate cause, a party must first show that the defendant's negligence was the actual cause of the injury. *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 1007 (2005). Plaintiffs assert that if the handgun was properly stored and secured as required by statute and Sheahan's general order, the shooting would not have occurred. Therefore, they argue that they established cause in fact, the first prong of proximate cause.

The second prong, legal cause, is met if it can be shown that the defendant's conduct was so closely tied to the injury that he may be found legally responsible. *Bourgonje*, 362 Ill. App. 3d

at 1007. Plaintiffs note that the exact harm involved need not be foreseeable, but only that some harm might result. *Brannon v. Southern Illinois Hospital Corp.*, 69 Ill. App. 3d 1, 10 (1978). Plaintiffs argue that the facts in this case present a strong argument for legal cause because the injury suffered is the exact type of harm the handgun storage statute and Sheahan's rules were enacted to prevent.

Because of this, plaintiffs argue that the trial court erred in finding Billy's actions an independent intervening cause. In order to escape liability as an intervening cause, an event must be unforeseeable as a matter of law. *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 57 (1996). Plaintiffs highlight as error the trial court's characterization that Billy loaded and unloaded the handgun before firing it at Josh. Plaintiffs claim that the court erred in making this characterization and then finding that Billy engaged in a criminal act. Plaintiffs contend that, even if some element of Billy's conduct was criminal, such criminal activity is no longer an independent intervening act *per se* under *Bourgonje. Bourgonje*, 362 Ill. App. 3d at 1008. As noted above, plaintiffs focus on the fact that Billy did not intend to shoot Josh. Therefore, Billy's actions were foreseeable and did not supersede Sheahan's liability. Plaintiffs assert that if the trial court's ruling is allowed to stand, it would effectively eliminate any cause of action for negligent storage of a weapon. Plaintiffs claim that the act of pulling the trigger ultimately required would always operate to cut off liability.

With respect to Beretta, plaintiffs argue that Beretta's experts conceded that children gain access to guns and that accidental shootings occur, specifically, accidents exactly like the instant scenario. In fact, plaintiffs note that Beretta's expert stated that this type of scenario was the impetus for the creation of the magazine disconnect safety in 1910. Furthermore, plaintiffs note

that Beretta manufactured other firearms with additional safeguards. Therefore, plaintiffs conclude that Billy's actions were not an independent intervening cause to absolve Beretta of liability for this tragedy.

Sheahan responds that David's storage of the handgun was a condition and not a cause of the shooting. Where the action of a defendant does not cause the injury, but a third party acting independently causes the injury, the creation of the condition is not a proximate cause. *Young*, 213 Ill. 2d at 449. Under *Young*, the key consideration in a case such as this is whether the intervening cause is such that a reasonable person would find it a likely result of the complained-of conduct. *Young*, 213 Ill. 2d at 449, quoting *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 258 (1999). Sheahan argues that the aforementioned actions of Billy, both criminal and in violation of David's house rules, were not foreseeable to a reasonable person and, therefore, David's actions were not a proximate cause.

Beretta also relies on *Young* to argue that Billy's criminal actions were an unforeseeable intervening cause relieving it of liability as a matter of law. Beretta argues that the adjudication of Billy as delinquent based on his commission of involuntary manslaughter and reckless discharge of a firearm and Billy's testimony affirm that he recklessly pulled the trigger and committed the crime. Beretta also cites to two federal cases that are factually similar to this case for support. *Eichstedt v. Lakefield Arms Ltd.*, 849 F. Supp. 1287, 1291-92 (E.D. Wis. 1994) (17-year-old boy's pointing rifle at friend and pulling trigger was reckless by any reasonable person, especially an "experienced handler of guns" like the shooter and summary judgment for gun manufacturer was proper); *Raines v. Colt Industries, Inc.*, 757 F. Supp. 819, 822-26 (E.D. Mich. 1991) (summary judgment was proper where the handgun is a simple tool, danger is open and obvious,

and shooter had played with gun for two days with prior experience manipulating the gun). Not only are these cases based on Wisconsin and Michigan laws and, as such, are merely persuasive authority, but they are distinguishable on the facts as well. Both cases involved gun users that were both older and more experienced than Billy. Furthermore, as noted below, the exception for the open and obvious danger of a simple product has been rejected in Illinois as a *per se* rule against liability. *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 262-63 (2007).

Proximate cause may not be proven based upon speculation or surmise, but must be proven to a reasonable certainty. *Bourgonje*, 362 Ill. App. 3d at 1007. As addressed above, viewing plaintiffs' complaint and evidence favorably, cause in fact was shown because the shooting would not have occurred if the handgun had been properly stored. Second, it was reasonably foreseeable that this type of harm would occur if the handgun was not properly stored based on the testimony of several experts and the specific rules and laws implemented for this exact concern.

The trial court opined that finding proximate cause in this case would create liability for Sheahan for any harm created if a weapon was stolen from an officer. However, plaintiffs do not argue for this extensive a finding. Rather, they point to Billy's testimony that the gun and ammunition were negligently stored in an unlocked case in violation of Illinois law and Sheahan's training and rules. This case is distinguishable from a stolen weapon scenario.

Under plaintiffs' theory, Billy in no way "stole" the handgun, as he never intended to deprive David of possession of the handgun and the underlying negligent storage is the cause of the harm. Whether or not that is the case, the scenario in this case in fact is exactly what the gun storage statute and Sheahan's own departmental rules and training programs sought to avoid. In

this case, a child found an improperly stored gun and played with it. While playing, the gun was accidentally discharged.

With respect to the intervening cause, Billy was adjudicated a delinquent, not convicted of a crime. While this court affirmed the findings of the juvenile court, the proceedings before that court are not of record. Whether Billy's actions were criminal and unforeseeable is an open question considering the fact that he is not a convicted criminal and the evidence presented by plaintiffs. Plaintiffs continue to assert that there was no intervening intentional attack to break the causal chain. In any event, under *Bourgonje*, whether Billy's actions were criminal or tortious in nature under the common law is not necessarily outcome determinative. Furthermore, as noted above, under *Hagan*, public policy dictates a differentiated approach to considering behavior by a child intentional and criminal as compared to that of an adult. We have concluded above that this accident was foreseeable and, therefore, it is a question for the jury.

### C. Plaintiffs' Claim the Handgun Was Unreasonably Dangerous

Plaintiffs next argue that the trial court erred in failing to find the handgun unreasonably dangerous under their strict product liability claim. Plaintiffs dispute Beretta's claim that the sole function of the handgun is to fire a projectile with each pull of the trigger. Plaintiffs argue that the function of the gun changed when Billy removed the magazine because he believed it to be unloaded, as if the safety were engaged, and, essentially, it became a toy gun. Additionally, they assert that the existence of a manual safety indicates that the handgun did not serve only one purpose, but had shifting functions. Plaintiffs assert that they demonstrated that the handgun was unreasonably dangerous and defectively designed under both the consumer expectation test and risk-utility test for product liability claims as detailed in *Hansen v. Baxter Healthcare Corp.*, 198

Ill. 2d 420, 433 (2002).

### 1. Consumer Expectation Test

Under the consumer expectation test, a plaintiff may prove a product defective " 'by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.' " *Hansen*, 198 Ill. 2d at 433, quoting *Lamkin v. Towner*, 138 Ill. 2d 510, 529 (1990). Beretta properly notes that the reasonable consumer for this review is not necessarily the user at the time of the incident, but the "typical user and purchaser" of the product, in this case, a licensed firearm owner. *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 257 (2007).

Plaintiffs cite to the Johns Hopkins study noted above, several cases from foreign jurisdictions, and testimony regarding the long-established patents for magazine disconnect safeties to establish the existence and knowledge of this device. Plaintiffs argue that this evidence demonstrates that it is reasonable an intended user would expect that the removal of the magazine would render the handgun harmless. Plaintiffs note David Swan's testimony that he did not know the handgun would fire without the magazine engaged. At a minimum, plaintiffs argue that this establishes a question of fact for the jury to determine and not simply take what Beretta says about its product over what the consumer believes.

Beretta argues that application of the consumer expectation test must lead to a finding that the handgun was not unreasonably dangerous. Beretta highlights that it is important to consider the nature and function of the product in addition to determining the ordinary consumer and how the product performed under this test. *Taylor v. Gerry's Ridgewood, Inc.*, 141 Ill. App. 3d 780, 784 (1986). Beretta first argues that the ordinary consumer of the handgun is not, as plaintiffs

assert, a 13-year-old child, but an adult who can better understand the dangers and consequences of handling a firearm.

Beretta asserts that a firearm has been considered an "instrument of death" by the courts and its basic function is purely to discharge a projectile when the trigger is pulled. *Taylor*, 141 Ill. App. 3d at 785. Experts for both parties testified that the function of a handgun is not to be a toy, but simply to fire bullets. Accordingly, Beretta concludes that plaintiffs' argument that the presence of a safety on a firearm does not alter its function.

With respect to the third consideration in the consumer expectation test, Beretta argues that *Taylor* is on point and controlling. In *Taylor*, the adult gun owner and friends had been drinking for hours and playing Russian roulette with his newly purchased revolver while it was unloaded. When preparing to leave, the owner reloaded the revolver and placed it on the table telling everyone it was loaded. One friend apparently did not hear this warning, picked up the gun and shot and killed another friend. *Taylor*, 141 Ill. App. 3d at 781-82.

The estate of the friend who was killed filed a strict liability claim against the manufacturer of the revolver, alleging that the double-action trigger was unreasonably dangerous and that it should have had a manual or automatic safety. The *Taylor* court affirmed the trial court's summary judgment order. The court noted that a manufacturer is not under a duty to design a product that is incapable of preventing injury or include safety features to foreclose any harm to its user. The court found that the plaintiff failed to prove the revolver was defective and that the revolver performed as designed. *Taylor*, 141 Ill. App. 3d at 784-85.

Beretta asserts that as in *Taylor*, and similar cases following *Taylor*, the handgun performed as expected given its nature and function. As in these cases, Billy was playing with the

handgun and it did what it was supposed to, discharging a bullet. Beretta repeatedly highlights the language in *Taylor* that "[o]nly a defective person would fail to realize the obvious dangers associated with these actions." *Taylor*, 141 Ill. App. 3d at 785.

Plaintiffs respond that the *Taylor* court made those comments in the context of a situation where grown men had been drinking heavily and playing with a firearm, not a 13-year-old boy simply playing with a gun. We agree with plaintiffs that the instant scenario is distinguishable. We would be remiss if we did not further note our belief that utilizing this language is inflammatory and inappropriate in this case. The duty of zealous advocacy does not require counsel to ignore common decency. This case is clearly distinguishable from *Taylor* and involves the tragic loss of a young boy and obvious damage to Josh's family and friends, as well as to Billy, David, and the Swan family. Testimony was received on the disruptive force this has been to all those involved and repeatedly labeling a 13-year-old boy as defective is not only unnecessary, but sad. We note, however, even if we were to accept Beretta's assessment of Billy as defective, it would strengthen the argument in favor of application of the *Hagan* case and allowing the case to go forward as a matter of public policy.

Furthermore, this language is entirely unnecessary considering Beretta's final argument that the handgun was purchased by David and used for law enforcement purposes. This particular model was designed and marketed by Beretta for military and police use. Beretta notes that testimony indicated that the handgun operated properly every time David used it and there had not been any reports of widespread defects of this handgun model. The Cook County Department of Corrections found it to be a safe and reliable firearm suitable for use as a duty pistol. Therefore, the record supports Beretta's conclusion that the handgun performed as

expected and was not unreasonably dangerous and summary judgment was proper under the consumer expectation test.

## 2. Risk-Utility Test

Under the risk-utility test, a plaintiff may establish a defective-design claim " 'by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs.' " *Hansen*, 198 Ill. 2d at 433, quoting *Lamkin*, 138 Ill. 2d at 529. Under *Calles*, accepted factors to be considered when engaging in a risk-utility analysis are:

" '(1) The usefulness and desirability of the product - its utility to the user and to the public as a whole.

(2) The safety aspects of the product - the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.' " *Calles*, 224 Ill. 2d at 264-65, quoting J. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L. J. 825, 837-38 (1973).

The *Calles* court also provided four factors to be considered with respect to the utility of a product. These factors are: the appearance and aesthetic attractiveness of the product; the utility for multiple uses; the convenience and extent of use without harm resulting from the product; and the collateral safety of a feature other than the one causing harm to the plaintiff. *Calles*, 224 Ill. 2d at 265-66, citing American Law of Products Liability 3d §28:19, at 28-30 through 28-31 (1997).

Plaintiffs argue that they not only showed that a safer alternative design existed, but that Beretta had manufactured such firearms at an admittedly marginal increased cost. Furthermore, Beretta's expert stated that there was no documentation available that the magazine disconnect safety would make the handgun more dangerous. Therefore, plaintiffs conclude that Beretta could have easily and cost-effectively equipped the handgun in a safer manner, but did not and as a result it was unreasonably dangerous.

Beretta claims that *Calles* upheld the "general rule" that manufacturers will not be held liable for harm resulting from a danger that is open and obvious to the typical user. *Calles*, 224 Ill. 2d at 262-63. However, the *Calles* court specifically rejected this general rule, citing to Illinois and foreign cases rejecting such a rule and the policy reasons supporting these findings. *Calles*, 224 Ill. 2d at 263. The *Calles* court continued to state that the open and obvious nature of the danger involved is an important factor in the risk-utility analysis, but "[a] *per se* rule would

also frustrate the policy of preventing future harm which is at the heart of strict liability law."

*Calles*, 224 Ill. 2d at 263.

In any event, Beretta argues that under the risk-utility test, the product still could not be found unreasonably dangerous. While not *per se* rules, the open and obvious danger of firearms and the intended user, military and police personnel, are both important factors in the calculus under *Calles*. Experts for all parties agreed that most police officers specifically refuse to utilize a magazine disconnect safety for fear of not being able to utilize their firearm when needed the most. Beretta argues that the testimony of several experts indicated that plaintiffs' proposed magazine disconnect safety would undermine the utility of the handgun as a law enforcement weapon. Beretta highlights witness testimony that over 20 years of requests for firearms from law enforcement agencies have overwhelmingly included specific requests that a magazine disconnect not be incorporated.

Beretta argues that the testimony of several experts indicated that plaintiffs' proposed magazine disconnect safety would undermine the utility of the handgun as a law enforcement weapon. In addition, Beretta points out the additional safety features that were included on the handgun. Further, with proper storage and handling of the handgun and adequate training, the handgun is not unreasonably dangerous. While, as discussed below, it is arguable that a suitable warning was not provided regarding the dangers involved in handling the handgun, that factor does not outweigh the other factors under *Calles* and the particular needs of police officers and the military. Accordingly, summary judgment was proper on this count under the risk-utility test.

### D. Plaintiffs' Failure to Warn Claim

Plaintiffs also argue that the trial court erred by finding that Beretta did not have a duty to

warn because of the open and obvious danger presented by the handgun. Plaintiffs again assert that it was reasonable for Billy to believe that the handgun was unloaded and inoperable when he removed the magazine. Plaintiffs assert that an ordinary person would believe the same and that Beretta had a duty to warn based on the level of awareness of an ordinary person. *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002).

Plaintiffs argue that this reasonable belief also removes the risk of the handgun as an open and obvious danger. *Miller v. Rinker Boat Co.*, 352 Ill. App. 3d 648, 666 (2004). A manufacturer must provide a warning for a product with dangerous propensities when the seller has greater knowledge of the risk of harm from the product and knows that harm will occur to the buyer absent a warning. *Bates v. Richland Sales Corp.*, 346 Ill. App. 3d 223, 232-33 (2004). Plaintiffs argue that the warnings provided by Beretta were insufficient. Plaintiffs cite to testimony that the chamber loaded indicator was hard to see and to the lack of any warning on the handgun that the chamber may be loaded without the magazine engaged. Plaintiffs argue again that foreseeability is the key consideration, without citation to authority for this issue, and that it was clearly proven by the facts of this case.

Beretta responds that summary judgment is appropriate on a failure to warn claim where the party failed to read product warnings. *Kane v. R.D. Werner Co.*, 275 Ill. App. 3d 1035, 1037 (1995). Beretta argues that Billy testified that he did not read any of the repeated and explicit warnings provided in the owner's manual. Secondly, it argues that no duty to warn exists where the danger involved is open and obvious. *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002). As noted above, the danger of pulling the trigger of a firearm has been found to be open and obvious.

Beretta again cites to *Taylor*, which also involved a failure to warn claim. The *Taylor*

court found that the potential danger of pulling a trigger on a firearm is open and obvious. *Taylor*, 141 Ill. App. 3d at 785. Beretta also cites to Billy's testimony that he knew he was handling a firearm with the potential to hurt or kill a human being. Therefore, Beretta concludes that the danger was open and obvious, and despite its extensive warnings contained in the owner's manual, Billy recklessly pulled the trigger on the handgun.

*Kane* does stand for the proposition Beretta claims, however. Its finding was qualified by the court's noting that, if the " 'nature of the alleged inadequacy is such that it prevents [the party] from reading [the warning],' " a failure to warn claim may stand. *Kane*, 275 Ill. App. 3d at 1037, quoting *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 971 (Ala. 1985). Plaintiffs provide several ways that Beretta failed to warn of the danger the handgun would fire without the magazine engaged. Plaintiffs claim the chamber loaded indicator should have been larger, the manual should have provided better warnings, and additional warnings could have been written on the handgun itself.

Interestingly, plaintiffs argue that *Taylor* was "of course not a warning issue case." However, the *Taylor* court specifically upheld the dismissal of a count sounding in negligence and alleging the revolver lacked adequate safeguards and warnings. *Taylor*, 141 Ill. App. 3d at 785. The *Taylor* court found that the manufacturer's warning to read the instruction manual before use and the warnings provided in the manual were extensive and adequate. Both parties also fail to note that the *Taylor* court specifically stated that rollmarked into the steel barrel of the revolver at question was a warning to read the instruction manual before use. *Taylor*, 141 Ill. App. 3d at 785. Because of this, the *Taylor* court concluded that the warning was communicated and the manual contained specific details that, if followed, the shooting would not have occurred.

In this case, the first line of the manual reads in bold and enlarged font "Caution: Read this manual carefully before handling and loading the pistol." As noted above, the manual repeatedly warns the user to make sure the cartridge chamber is empty when storing the firearm and provides step-by-step instructions on how to accomplish this. The manual clearly reads that removing the magazine does not clear a loaded chamber. However, the manual does not contain any notation or warning whether or not a handgun may fire the chambered bullet when the magazine is removed. Thus, the holding in *Kane* is not helpful to Beretta because even if Billy had read the entire manual, he would not have been warned that removing the magazine does not mean the handgun will not discharge a bullet.

Beretta clearly has greater knowledge of the danger of the handgun than the typical user. The nature of the inadequacy in this case was that a user was not pointed to a warning in any event. Plaintiffs provided evidence that over a third of adults questioned in the Johns Hopkins study either believed that a gun would not fire with its magazine removed or did not know either way. In fact, an experienced user such as David, a trained police officer, did not know that the firearm may fire a bullet with the magazine removed. Therefore, plaintiffs' failure to warn claim presented a question of fact and should have survived summary judgment to determine if Beretta's warnings were sufficient.

E. Protection of Lawful Commerce in Arms Act

Finally, Beretta asserts that this cause of action must be immediately dismissed pursuant to the PLCAA. Beretta argues that the PLCAA, enacted on October 26, 2005, two months after the trial court granted summary judgment for Beretta, prohibits civil suits against manufacturers, importers, distributors, and dealers of firearms for harms caused by criminal or unlawful third

party misuse of firearms that function properly as designed and intended. Pub. L. 109--12, 119 Stat. 2095 (2005) (adding 15 U.S.C. §§7901(a)(3), (b)(1)). Beretta argues that the PLCAA retroactively prohibits civil suits such as plaintiffs' under section 7902(b) (Pub. L. 109--12, 119 Stat. 2095, 2096 (2005)) (adding 15 U.S.C. §7902(b)) and that this court must apply the law as it exists at appeal unless doing so would interfere with a vested right (*Caveney v. Bower*, 207 Ill. 2d 82, 85 (2003)).

With the PLCAA, Congress sought to protect the gun industry from ruin due to lawsuits under "theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bone fide expansion of the common law" to be possibly sustained by a "maverick judicial officer or petit jury." Pub. L. 109--12, 119 Stat. 2095 (2005) (adding 15 U.S.C. §7901(a)(7)). Congress also found that these "qualified civil liability actions" threatened the important principles of federalism, state sovereignty and the separation of powers doctrine. Pub. L. 109--12, 119 Stat. 2095 (2005) (adding 15 U.S.C. §7901(a)(8)). Section 7903(5)(A) defines a "qualified civil liability action" as "a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages *** resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." Pub. L. 109--12, 119 Stat. 2095, 2097 (2005) (adding 15 U.S.C. §7903(5)(A)). "Unlawful misuse" is defined as "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." Pub. L. 109--12, 119 Stat. 2095, 2097 (2005) (adding 15 U.S.C. §7903(9)).

Beretta states that it is unchallenged that it is a manufacturer of guns under sections 7903(2) & (5)(A) of the PLCAA. Pub. L. 109--12, 119 Stat. 2095, 2097 (2005) (adding 15

U.S.C. §§7903(2) & (5)(A)). The handgun is a "firearm" and a "qualified product" under the PLCAA. Pub. L. 109--12, 119 Stat. 2095, 2097 (2005) (adding 15 U.S.C. §7903(4)). Therefore, Beretta concludes that because Billy was adjudicated a delinquent for involuntary manslaughter and reckless discharge of a firearm, he unlawfully misused the handgun and the action must be dismissed under section 7902(b).

Plaintiffs argue that the PLCAA does not apply to this case. Plaintiffs assert that the target of the PLCAA was actions brought by states, municipalities, interest groups and others attempting to force the gun industry to pay for the crimes of third parties under novel theories. Pub. L. 109--12, 119 Stat. 2095 (2005) (adding 15 U.S.C. §§7901(a)(3), (a)(7), (a)(8)). Therefore, an accidental shooting like Billy's that, plaintiffs argue, could have been avoided with additional safety features and proper warnings was not Congress's intended target. Furthermore, plaintiffs argue that their cause of action fits within the exceptions to qualified civil liability actions provided by the PLCAA. The relevant exceptions to the PLCAA are as follows:

"(ii) an action brought against a seller for negligent entrustment or negligence per se;

***

(iv) an action for breach of contract or warranty in connection with the purchase of the product;

(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then

such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage." Pub. L. 109--12, 119 Stat. 2095, 2097 (2005) (adding 15 U.S.C. §§7903(5)(A)(ii), (5)(A)(iv), (5)(A)(v)).

Plaintiffs assert that their claims meet the exceptions for negligence and breach of warranty under sections 7903(5)(A)(ii) and 7903(5)(A)(iv) and the exception for actions based on defect or design under section 7903(5)(A)(v). Plaintiffs argue that they overcame the limitations on exception 5(A)(v) for volitional acts that constitute criminal offenses because Billy did not intend to shoot and kill Josh. Plaintiffs argue that Congress's use of "criminal offense" intended the limitation to criminal actions with accompanying *mens rea* and not reckless actions like Billy's. Plaintiffs argue that this court's Rule 23 order affirming the adjudication of delinquency was improperly utilized to establish the criminality of Billy's behavior and that the evidence establishing this is incomplete and not of record. Plaintiffs also assert that their claims against Beretta resulted from the product's condition. Therefore, plaintiffs conclude that Billy's actions were not the sole cause of harm and not covered by the PLCAA.

Plaintiffs finally assert that the PLCAA is unconstitutional because it violates the tenth amendment. Plaintiffs argue that the United States Supreme Court has clearly stated that the United States Constitution does not grant Congress authority to direct the action of state governments. Rather, Congress may only enact generally applicable laws requiring or prohibiting certain acts and may not command the states to require or prohibit those acts. *New York v. United States*, 505 U.S. 144, 165-66, 178-79, 120 L. Ed. 2d 120, 143-44, 152-53, 112 S. Ct. 2408, 2422-23, 2429-30 (1992). Plaintiffs claim that Congress's command to state courts to immediately dismiss qualified civil actions violates the tenth amendment.

Beretta responds that this appeal only involves plaintiffs' claims sounding in strict liability; thus, the negligence and warranty exceptions are irrelevant. Beretta also contends that plaintiffs failed to show that the handgun was used as intended or in a reasonably foreseeable manner and not in a manner that would constitute a criminal offense as required by the exception under section 7903(5)(A)(v). Beretta argues that it was proven that Billy's act in purposefully pulling the trigger was a volitional act that solely caused the harm and was properly found to be a criminal act. Beretta asserts that plaintiffs have tried to avoid this conclusion with meaningless semantics.

Beretta states that Congress repeatedly made clear its intent that the gun industry not be liable for harm caused by criminal and unlawful misuse of its products. Pub. L. 109--12, 119 Stat. 2095 through 2097 (2005) (adding 15 U.S.C. §§7901(a)(3) through (a)(5), (a)(7), (a)(8), 7903(5)(A)). Beretta argues that plaintiffs incorrectly claim that the PLCAA does not apply because Billy's conduct was not the "sole cause" of the harm under section 7901(b)(1). Beretta argues that the language of section 7903(5)(A)(v) is conclusive that if the act in question is found criminal, "such act shall be considered the sole proximate cause of any resulting death, personal injuries, or property damage." Pub. L. 109--12, 119 Stat. 2095, 2097 (2005) (adding 15 U.S.C. §7903(5)(A)(v)).

First, we agree with Beretta that plaintiffs have confused Congress's direct regulation and preemption of state law with commandeering state functions. Congress, Beretta correctly asserts, simply established a new federal standard that governs claims against the gun industry, preempting conflicting state tort law, a common action. See *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 571, 134 L. Ed. 2d 809, 823-24, 116 S. Ct. 1589, 1596-97 (1996). The PLCAA has been

examined by the United States District Courts for the Eastern District of New York and the Central District of California in the context of nuisance claims against gun manufacturers. *City of New York v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 266-67 (E.D.N.Y. 2005); *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274 (C.D. Cal. 2006).

While both of these courts are federal district courts in foreign jurisdictions, their reasoning is sound and we follow these decisions on the constitutional issues. Both of these decisions included detailed examinations of the constitutionality of the PLCAA, including thorough reviews of the legislative history of the statute. In both cases, the courts found that, though there are differing opinions supporting the reasons to protect the gun industry, Congress cited proper support to utilize the commerce clause and the PLCAA was constitutional. *City of New York*, 401 F. Supp. 2d at 271-97; *Ileto*, 421 F. Supp. 2d at 1298-1304.

Both courts examined whether the PLCAA violated the due process or equal protection clause and whether it was a bill of attainder. Both courts found no violation in these areas, principally from the fact that one does not have a vested right in a lawsuit until a final, unreviewable judgment has been reached. *City of New York*, 401 F. Supp. 2d at 271-97; *Ileto*, 421 F. Supp. 2d at 1298-1304. With respect to the tenth amendment, the *City of New York* court simply stated there was no violation because Congress is not commandeering the states by means of the Act. *City of New York*, 401 F. Supp. 2d at 294. Beretta properly notes that the PLCAA does not compel states to regulate anything or enact any law. The PLCAA simply establishes a federal standard for claims against the gun industry.

It is clear from the PLCAA and legislative history that plaintiffs correctly assert that Congress was primarily concerned with novel nuisance cases like *Ileto* and *City of Chicago v.*

*Beretta U.S.A. Corp.*, 213 Ill. 2d 351 (2004). However, based on the plain language of the statute, plaintiffs must show they fall within the exceptions to avoid the provisions of the Act. Plaintiffs failed to support their claim that exceptions under section 7903(5)(A)(ii) for negligent entrustment or negligence *per se* and section 7903(5)(A)(iv) for breach of contract or warranty in this case. Therefore, the exception under section 7903(5)(A)(v), which allows for a claim alleging a defect in design or manufacturing, absent a volitional criminal act, is the only applicable exception to this case.

Beretta argues that Billy's testimony and the delinquency adjudication prove that the gun was discharged by a volitional act that constituted a criminal offense. However, as we have held above, plaintiffs have provided evidence that Billy's actions were not unlawful. While we look at the delinquency adjudication deferentially, it is not the law of this case and not the result of proceedings subject to the protections of the sixth amendment. Whether Billy's act was volitional or whether he understood the ramifications of his conduct to support summary judgment or affording compensation to victims as *Hagan* argues for, is a question for the trier of fact.

We do not have the record of those proceedings before us and do not know the evidence that was presented. We do have the evidence plaintiff has presented in this case supporting a finding that Billy's actions were accidental. Whether Billy's actions were criminal or unlawful is a question of fact for the finder of fact based on all the evidence. If Billy's actions were criminal, the PLCAA would foreclose plaintiffs' claims against Beretta. However, if Billy's actions were found to be purely accidental and not unlawful or criminal, the exception under section 7903(5)(A)(v) would apply and the PLCAA would not preclude plaintiffs' claims against Beretta.

III. CONCLUSION

For the foregoing reasons, we reverse in part and affirm in part the decision of the trial court and remand the matter for further proceedings consistent with this opinion. We note that Sheahan raised sections 2-109, 2-204, 2-201 and 2-202 of the Local Governmental and Governmental Employees Tort Immunity Act as affirmative defenses to the complaint. 745 ILCS 10/2-109, 2-201, 2-202, 2-204 (West 2004). The trial court did not address this issue and our finding that Sheahan is liable under the principle of *respondeat superior* does not end the analysis. The existence of a duty and the existence of an immunity are distinct issues that must be analyzed separately. *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001), citing *Barnett v. Zion Park District*, 171 Ill. 2d 378, 388 (1996).

Affirmed in part and reversed in part, remanded for a new trial.

_____Presiding Justice Quinn, and Justice Campbell, concur.