No. 2-08-0878    Filed: 4-28-10

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| NANCY TURNER and STEFANIE TURNER, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Nos.   02--L--243        04--AR--174 |
| NORTHERN ILLINOIS GAS COMPANY, d/b/a Nicor Gas Company, | ) ) ) | |
| Defendant-Appellee | ) ) | Honorable |
| (American Family Mutual Insurance Company, Plaintiff). | ) ) | J. Edward Prochaska, Judge, Presiding. |

_____

JUSTICE BURKE delivered the opinion of the court:

On May 28, 2002, plaintiffs, Nancy Turner and her teenage daughter, Stefanie Turner, were seriously injured when a natural gas explosion destroyed their rental home. Case number 02--L--243 is a personal injury case that plaintiffs filed against defendant Northern Illinois Gas Company, d/b/a Nicor Gas Company, which had supplied and regulated the gas supply to the building. Case number 04--AR--174 is a subrogation action that American Family Mutual Insurance Company (American Family) filed against defendant to recover sums American Family paid to or on behalf of its insured, Nancy Turner, for personal property damages she incurred from the explosion.

Plaintiffs' fifth amended complaint alleged that defendant was negligent for failing to thoroughly inspect the gas piping in their basement and to warn plaintiffs of any risk posed by the

condition of the piping. Before the date of the explosion, plaintiffs neither detected nor alerted defendant to a possible gas leak. However, plaintiffs alleged that defendant received constructive notice of a problem when defendant's employee was at the premises on a service call 17 months before the explosion. The trial court granted defendant summary judgment on the ground that defendant owed no duty to inspect for the defect or to warn plaintiffs. We affirm.

FACTS

Plaintiffs were residing at 2025 Eggleston Road in Rockford on May 28, 2002, when they were seriously injured by the natural gas explosion, which destroyed the building. Natural gas is odorless in its original state. The chemical ethyl mercaptan, which is a sulfur component, is added as an odorant to give natural gas its distinctive smell so leaks can be detected more easily. On the night before the explosion, Stefanie, who was a junior in high school at the time, arrived home at 10:30 p.m. She detected a faint odor when she walked into the home, but she did not identify it as natural gas because she did not know what natural gas smells like. The odor seemed to come from the kitchen, so Stefanie believed it was from something her mother had cooked. Nancy was in bed at the time, and Stefanie went to bed also.

On May 28, 2002, Nancy woke up around 6:30 a.m. and smelled what she thought was natural gas. Nancy knew that a gas leak created a risk of fire or an explosion. Stefanie recognized the odor as the same she had detected the night before, but the smell had grown much stronger. Following the odor, Nancy and Stefanie descended the basement stairs. Stefanie stated in her affidavit that the staircase was enclosed. The basement was unfinished, but Nancy had placed a bed in the southeast corner of the basement for her son to use when he came home from college. At the bottom of the stairs, various natural-gas-fueled appliances were ahead and to the right in the

northwest corner of the basement. Nancy turned left and heard a hissing noise and saw a broken pipe in the ceiling of the southeast corner above the bed. According to Stefanie, if a person stood near the appliances in the northwest corner, the staircase would block the view of the southeast corner where the leak occurred.

Nancy described the pipe as hanging in a "V" shape and separated at the bottom. Stefanie saw that the break in the pipe appeared to be directly below the gas stove in the kitchen upstairs. The break was in a long stretch of pipe that appeared to have broken at a connection point.

Nancy told Stefanie that they needed to get out of the house. Nancy walked up the stairs to call 911, and Stefanie walked to the laundry area of the basement to retrieve a pair of pants to wear. Nancy testified that the explosion occurred right after she dialed the "9" on the telephone. Stefanie testified that she had reached the foot of the basement stairs when she heard a tick and the house blew up.

Nancy was thrown to the front yard, and her left leg was broken in four places and a portion of her foot was severed completely. Nancy also suffered a fractured right clavicle and a collapsed lung. Stefanie felt intense heat during the explosion and could not free herself from the rubble because her right foot was trapped. Stefanie screamed and was helped by neighbors. Stefanie suffered a collapsed lung and severe burns to her arms, hands, abdomen, and back. The explosion was traced to the gas leak in the exposed pipe in the southeast corner of the basement.

Following the explosion, Mark Marinaro, a fire scene investigator for the City of Rockford, investigated the scene. Jerry Roberts, one of defendant's representatives, told Marinaro that the gas supplied to plaintiffs' residence contained the odor additive. Marinaro testified at his deposition that he did not know whether there was any deficiency in the gas piping. Marinaro concluded that

defendant's exterior gas meter was not involved in the gas leak at plaintiffs' residence and that no other residence on the street had been leaking gas. Marinaro concluded that the source of the ignition was either the furnace or the water heater and that the explosion was caused by a single leak in the broken pipe that Nancy had identified.

The parties submitted evidence of the installation and maintenance of the gas piping. In 1995, Maynard Jarl built the duplex at 2023-25 Eggleston Road. Warren Plumbing Company installed the interior plumbing and gas lines. In 1998, the City of Rockford sent Latisha Cardeno, a building inspector, to evaluate the building. Cardeno's inspection ticket does not show any code violations or problems with the gas piping.

On December 5, 2000, Carol Miranda resided at 2025 Eggleston and called defendant to report that she had no gas or hot water. Defendant's technician Gerald Dray determined that the exterior gas meter was "stuck" and would not send gas to the residence. Dray performed the ordinary repair for the problem. He turned off the gas service, replaced the meter, reactivated the gas service, and went inside to relight the pilot lights on the gas-fueled appliances, including the furnace and the water heater in the basement.

Plaintiffs introduced evidence of service calls to the adjacent apartment, which was a mirror image of plaintiffs' residence. On May 18, 1999, Cindy Sommers called defendant about an odor from her range at 2023 Eggleston. The record of the service call contains the note "Left Range Valved Off," which indicates that the technician must have found a condition hazardous enough to warrant shutting off the appliance. The technician left a hazard tag on the range, and a copy of the tag would have been returned to defendant.

On February 1, 2001, which was just two months after the meter replacement at 2025 Eggleston, Sommers reported poor gas pressure at 2023 Eggleston. Defendant's technician responded to the call and determined that Sommers' meter also was stuck. The meter was replaced.

Plaintiffs moved into 2025 Eggleston on March 1, 2001. Until the explosion on May 28, 2002, plaintiffs' only contact with defendant was to initiate gas service.

In 2002, plaintiffs filed a complaint against Jarl, who was the owner and general manager of the premises, and against Warren Plumbing Company, which had installed the gas piping. Plaintiffs alleged that their interior gas piping had been installed negligently and had caused the explosion. In 2004, plaintiffs added defendant to the suit. Plaintiffs settled with Jarl and Warren Plumbing Company and filed a fifth amended complaint, against defendant alone.

The fifth amended complaint alleged the negligent operation of defendant's gas facilities, such as meters, and negligent failure to inspect or to warn plaintiffs about the condition of the customer-owned interior gas piping. Plaintiffs alleged that, "for some time" before the explosion, the gas piping created hazardous conditions, including the following: the gas lines were not piped according to particular codes; the pipes lacked adequate hangers; the hangers were insufficiently spaced; the pipes were connected with improper couplings and bushings; at least one of the pipes was cross-threaded; a pipe was uncapped; and a pipe in the basement was not properly affixed to the ceiling. Plaintiffs alleged that defendant knew or should have known of these hazardous conditions.

Plaintiffs allege that defendant owed and breached duties (1) "to inspect, maintain, and regulate the gas service at 2025 Eggleston Road in Rockford, Illinois in a reasonably safe manner for the safety of its users, in particular the plaintiffs" and (2) "to warn the plaintiffs *** of any dangerous and/or hazardous conditions related to the gas lines, gas meter, gas service and/or gas appliances" that

defendant knew or should have known were present. Plaintiffs alleged that defendant acted negligently and proximately caused the injuries by inadequately inspecting the premises, failing to correct the dangerous conditions, failing to warn plaintiffs of the risk, and failing to provide adequate gas service.

Defendant moved for summary judgment under section 2--1005 of the Code of Civil Procedure (735 ILCS 5/2--1005 (West 2008)). Plaintiffs abandoned their allegation of negligent operation of defendant's gas facilities, but they defended their claim for negligent failure to inspect or to warn plaintiffs about the interior gas piping.

In its motion for summary judgment, defendant argued that (1) none of defendant's equipment caused the explosion and (2) defendant owed plaintiffs no duty under common law and, even if any common-law duty existed, it was disclaimed by the tariff defendant had filed with the Illinois Commerce Commission (ICC). A tariff is a public document setting forth the services being offered; the rates and the charges for the services; and the governing rules, regulations, and practices relating to those services. Adams v. Northern Illinois Gas Co., 211 Ill. 2d 32, 55 (2004). The Public Utilities Act requires public utilities such as defendant to file tariffs with the ICC. 220 ILCS 5/9--102 (West 2008); Adams, 211 Ill. 2d at 55. A tariff is usually drafted by the regulated utility, but when duly filed with the ICC, it binds both the utility and the customer and governs their relationship. Adams, 211 Ill. 2d at 55. Once the ICC approves a tariff, it " 'is a law, not a contract, and has the force and effect of a statute.' " Adams, 211 Ill. 2d at 55, quoting Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc., 67 Ill. App. 3d 435, 439 (1978), aff'd, 78 Ill. 2d 56 (1979).

Defendant's tariff on file with the ICC provides in relevant part as follows:

"Equipment Furnished and Maintained by Customer

All gas utilization equipment, piping, and vents furnished by the customer shall be suitable for the purposes hereof and shall be installed and maintained by the customer at all times in accordance with accepted practice and in conformity with public health and safety, as set forth by the properly constituted authorities and by the company.

The company assumes no responsibility in connection with the installation, maintenance or operation of the customer's equipment and reserves the right to discontinue service if such equipment is in unsatisfactory condition."

Such tariff provisions are usually referred to as liability limitations. Adams, 211 Ill. 2d at 56. The underlying theory of liability limitations is that, because a public utility is strictly regulated, its liability should be defined and limited so that it can provide service at reasonable rates. A reasonable rate depends in part on a rule limiting liability. Adams, 211 Ill. 2d at 57. The goal of a tariff is to secure reasonable and just rates for all without undue preference or advantage to any; and because that end is attainable only by adherence to the approved rate, based upon an authorized classification, that rate represents the whole duty and the whole liability of the company. Adams, 211 Ill. 2d at 57.

The trial court granted defendant summary judgment on the basis that defendant owed no duty to inspect the interior gas piping for defects or to warn plaintiffs. The trial court identified several undisputed facts. Defendant did not install, own, or have any control over the interior pipes or fixtures on plaintiffs' premises. Defendant was not responsible for the condition of plaintiffs' interior pipes or fixtures. Defendant never received a report of a gas leak at plaintiffs' premises. Defendant had no actual notice of a defect in plaintiffs' interior pipes or fixtures.

First, the court held that "the gas company in the present case had absolutely no notice of the defect in plaintiffs' interior piping, actual or constructive" and "the mere presence of [defendant's]

employee in plaintiffs' basement did not provide notice of the problem *** nor did it create a duty to inspect the interior piping in the basement." Second, the court ruled that defendant owed plaintiff no duty of care to inspect the premises, because the explosion was not reasonably foreseeable. Third, the court held that defendant's internal policies did not create a duty to inspect, despite plaintiffs' allegations. Fourth, the court ruled that defendant's tariff had the force and effect of law and that it disclaimed any responsibility in connection with the installation, maintenance, or operation of plaintiffs' equipment.

ANALYSIS

Plaintiffs' fifth amended complaint alleges that defendant was negligent for failing to inspect the interior pipes in plaintiffs' basement during a service call 17 months before the explosion. During the service call, the technician replaced a "frozen" or "stuck" exterior gas meter and, as part of his job, went into the basement of plaintiffs' home to restart the pilot lights on several natural-gas-powered appliances. Under plaintiffs' theory, the technician should have recognized that the pipes in another area of the basement had been installed incorrectly so as to create a dangerous condition and he then should have turned off the gas supply and warned plaintiffs of the risk, even though there was no evidence of a leak at that time. The trial court concluded that defendant owed no such duty to inspect.

On appeal, plaintiffs argue that, construed most favorably to them, the record supports the conclusion that defendant owed plaintiffs a duty to inspect the premises, to warn of the risks, and to exercise reasonable care in its provision and regulation of the gas service. Plaintiffs contend that (1) defendant's tariff did not foreclose a duty under common law; (2) defendant had constructive notice of the defect and therefore owed plaintiffs a duty; (3) defendant owed plaintiffs a duty even though

defendant neither caused nor contributed to the defect; and (4) the likelihood and foreseeability of an injury to plaintiffs outweighed any burden associated with defendant's duty. Plaintiffs argue that summary judgment was precluded by a genuine issue of material fact as to whether defendant had constructive notice of the gas piping defects at the premises. For the reasons that follow, we conclude that the trial court correctly granted defendant summary judgment because defendant had neither constructive nor actual knowledge of the defect, and therefore defendant did not owe plaintiffs a duty to inspect the piping, warn of the risk, or repair any defect in the piping. Our conclusion that defendant owed no common-law duty obviates the need to consider plaintiffs' argument regarding defendant's tariff.

In a negligence action, the plaintiff must provide sufficient facts showing the existence of a duty owed by the defendant, a breach of that duty, and an injury proximately resulting from the breach. Klitzka v. Hellios, 348 Ill. App. 3d 594, 596 (2004), citing Vesey v. Chicago Housing Authority, 145 Ill. 2d 404, 411 (1991). The existence of a duty is a question of law for the court to decide, but the issues of breach of that duty and of proximate cause are factual matters for a jury to decide. Adams, 211 Ill. 2d at 43-44. There can be no recovery in tort for negligence unless the defendant has breached a duty owed to the plaintiff. Adams, 211 Ill. 2d at 44. Duty is a question of whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. Adams, 211 Ill. 2d at 44. In determining whether a duty exists, a court looks to certain relevant factors, including: (1) the reasonable foreseeability that the defendant's conduct may injure another; (2) the likelihood of an injury occurring; (3) the magnitude of the burden of guarding against such injury; and (4) the consequences of placing that burden on the defendant. Adams, 211 Ill. 2d at 44.

"Where the plaintiff fails to provide facts 'from which the court could infer the existence of a duty,' summary judgment for the defendant is appropriate." Klitzka, 348 Ill. App. 3d at 596, quoting Vesey, 145 Ill. 2d at 411. In all appeals from the entry of summary judgment, we conduct a de novo review of the record. Klitzka, 348 Ill. App. 3d at 596-97, citing Espinoza v. Elgin, Joliet & Eastern Ry. Co., 165 Ill. 2d 107, 113 (1995).

The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a genuine issue of material fact exists. Adams, 211 Ill. 2d at 42-43. Summary judgment is appropriate where the pleadings, affidavits, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2--1005(c) (West 2008); Klitzka, 348 Ill. App. 3d at 597. In reviewing a grant of summary judgment, this court must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the nonmoving party. Williams v. Manchester, 228 Ill. 2d 404, 417 (2008). Where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact. Espinoza, 165 Ill. 2d at 114. If a party moving for summary judgment introduces facts that, if not contradicted, would entitle him to a judgment as a matter of law, the opposing party may not rely on his pleadings alone to raise issues of material fact. Klitzka, 348 Ill. App. 3d at 597, citing Hermes v. Fischer, 226 Ill. App. 3d 820, 824 (1992).

The summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit. Adams, 211 Ill. 2d at 43. However, summary judgment is a drastic means of disposing

of litigation that should not be granted unless the movant's right to judgment is clear and free from doubt. Forsythe v. Clark USA, Inc., 224 Ill. 2d 274, 280 (2007).

Natural gas is a dangerous substance when it is not under control. A gas company is not liable as an insurer for injuries sustained as the result of the escape of gas but, rather, for its negligence in permitting the gas to escape. Adams, 211 Ill. 2d at 45. Expressions of the degree of care that a gas company must exercise range from "reasonable" to "high," and the variety of expression simply means that the degree of care to prevent the escape of gas from its pipes must be proportional to the level of danger that the company must avoid. Adams, 211 Ill. 2d at 45.

Although a gas company must exercise the requisite degree of care so that no injury occurs in the distribution of gas while it is under the company's control, such responsibility is limited to when the gas is in the company's own pipes. Adams, 211 Ill. 2d at 46, citing Doxstater v. Northwest Cities Gas Co., 65 Idaho 814, 826-27, 154 P.2d 498, 504 (1944). In Illinois, the seminal example of the common-law rule pertaining to gas distribution in a consumer's pipes and fixtures is Clare v. Bond County Gas Co., 356 Ill. 241 (1934).

In Clare, the plaintiff operated a shop in a building that had been piped for natural gas. Clare, 356 Ill. at 242. In 1931, the natural gas delivered to the building was odorless. Clare, 356 Ill. at 243. The plaintiff bought a gas stove for heat and hired a plumber to install it. After the installation, the plaintiff noticed an offensive odor that gave her a headache and irritated her eyes and respiratory organs. Clare, 356 Ill. at 242. The plaintiff notified the gas company, whose president visited the shop with the plumber and concluded that the odor was caused by the fumes of burned gas. The company president made several visits and recommended various remedies, including checking the stove and the gas meter. The suggestions were implemented, but the problem continued. Clare, 356

Ill. at 242. The smell was so strong in the closet where the gas meter was located that the plaintiff kept the closet door closed. The source of the odor could not be found. Clare, 356 Ill. at 242.

Several weeks later, a friend of the plaintiff was looking for a screwdriver in the dark closet and lit a match to see. An explosion occurred, blowing apart the floor. An investigation disclosed that a gas pipe running beneath the floor contained holes caused by rust. The gas that escaped from the pipe had accumulated in the closet and was ignited by the match. Clare, 356 Ill. at 242-43.

The gas company presented evidence that some natural gas has a faint odor, if confined to a small room, but the gas furnished by the company had none at all, and that the fumes from burned gas affect the nose and eyes, but unburned gas does not. The company's president made several attempts to locate the odor's source, he had no knowledge that gas was escaping, and the plaintiff's complaints of eye and respiratory irritation convinced him that the trouble came from burned gas fumes. Clare, 356 Ill. at 243.

The plaintiff obtained a judgment against the gas company. On appeal, the company argued that "there was no evidence in the record to warrant the finding that it [the gas company] had notice and knowledge that the pipes were leaking and gas was escaping into the building; that without such notice or knowledge there was no duty incumbent upon it to shut off the gas supply." Clare, 356 Ill. at 243.

The Clare court ruled for the gas company, relying on established common law: "In the absence of notice of defects it is not incumbent upon a gas company to exercise reasonable care to ascertain whether or not service pipes under the control of the property owner or the consumer are fit for the furnishing of gas." Clare, 356 Ill. at 244. The court held that, where a gas company does not install the pipes or fixtures on a customer's premises, does not own them, and has no control over

them, the company is not responsible for their condition or for their maintenance, and therefore the company is not liable for injuries caused by a leak therein of which the company had no knowledge. Clare, 356 Ill. at 244.

The Clare court looked to the common law as it had evolved to that time, and Clare continues to accord with our understanding of the common-law rule. Adams, 211 Ill. 2d at 47, citing Oliver v. Peoples Gas Light & Coke Co., 5 Ill. App. 3d 1093, 1099 (1972); Bellefuil v. Willmar Gas Co., 243 Minn. 123, 126, 66 N.W.2d 779, 782 (1954) (discussing rule in context of gas appliances); Doxstater, 65 Idaho at 827-28, 154 P.2d at 504, quoting Kelley v. Public Service Co. of Northern Illinois, 300 Ill. App. 354, 362 (1939); 27A Am. Jur. 2d Energy & Power Sources §§394, 395 (1996) (stating rule in context of appliances); 27A Am. Jur. 2d Energy & Power Sources §403 (1996) (stating general rule); 38A C.J.S. Gas §123, at 151-53 (1996); Annot., Liability for Gas Company for Injury or Damage Due to Defects in Service Lines on Consumer's Premises, 26 A.L.R.2d 156 (1969).

Adams explains the rationale underlying the general rule announced in Clare. A person's duty can extend no further than the person's right, power, and authority to implement it, and a gas company employee does not have the right to enter the premises of a consumer to inspect pipes or fixtures except upon the license or permission of the owner. Adams, 211 Ill. 2d at 47, citing Clare, 356 Ill. at 244. The consumer, by applying for gas service, assumes the burden of inspecting and maintaining the pipes and fittings on the consumer's property in a manner reasonably suited to accommodate the required service. Adams, 211 Ill. 2d at 47. The company has the right to assume that the consumer's interior system of pipes and fittings is sufficiently secure to permit the gas to be introduced with safety. Adams, 211 Ill. 2d at 47-48, citing Clare, 356 Ill. at 244-45.

"Courts also reason that, in a negligence action, knowledge of the facts out of which the duty to act arises is essential." Adams, 211 Ill. 2d at 48. For an act or omission to be regarded as negligent, the defendant must have known, or ought to have known from the circumstances, that the allegedly negligent act or omission endangered another. Adams, 211 Ill. 2d at 48. Accordingly, the common-law rule that a gas company has no duty with respect to a consumer's pipes or fittings is premised on the gas company's lack of knowledge or notice of a gas leak. Adams, 211 Ill. 2d at 48, citing Bellefuil, 243 Minn. at 129, 66 N.W.2d at 784 ("the duty, by reason of actual or constructive notice of some dangerous condition, must arise before the gas company can be found negligent for its failure to inspect or shut off the gas supply").

The common-law rule has an exception on which plaintiffs now rely: " 'Where it appears that a gas company has knowledge that gas is escaping in a building occupied by one of its consumers, it becomes the duty of the gas company to shut off the gas supply until the necessary repairs have been made although the defective pipe or apparatus does not belong to the company and is not in its charge or custody.' " Adams, 211 Ill. 2d at 48, quoting Clare, 356 Ill. at 243-44.

Plaintiffs argue that "[c]onstructive notice of a possible defect is sufficient [to create a duty], and examining the instant case against the backdrop of Clare and Adams, it is apparent that [defendant] was placed on adequate notice of potentially dangerous deficiencies pertaining to the gas piping in the Eggleston Road duplex." Plaintiffs cite only the following evidence to support this conclusion: (1) the service call to 2025 Eggleston in December 2001; (2) the two service calls to 2023 Eggleston in May 1999 and February 2001; and (3) the initiation of gas service at the two residences.

First, plaintiffs concede that defendant had no actual notice of the dangerous condition until the duplex exploded. Second, viewing the evidence liberally in the light most favorable to plaintiffs, we conclude that there is no genuine issue of material fact as to whether defendant had constructive notice of the defect. See Williams, 228 Ill. 2d at 417. Under Clare and Adams, reasonable persons could not draw divergent inferences from the undisputed material facts: defendant lacked constructive notice. See Espinoza, 165 Ill. 2d at 114.

In the fifth amended complaint, plaintiffs identified improper piping installation as the defect about which defendant knew or should have known. The service call at 2025 Eggleston 17 months before the explosion did not give defendant constructive notice of any risk of explosion. There was no evidence of an existing gas leak. At all relevant times, the natural gas supplied to the duplex contained the legally mandated odorant, and plaintiffs have never alleged that Sommers or the technician detected the odor, heard a hissing sound, or saw a break in the piping. Once the gas meter was repaired and the gas service reactivated, the natural gas passed through the piping as intended. The technician left the premises because the identified problem had been fixed, and nothing he observed while replacing the meter gave any indication that another problem existed.

One could argue that defendant would owe a duty to inspect and to warn if the defect was easily detectable, such as by smelling or hearing leaking gas or by observing defective pipes in the technician's immediate work area. However, the defect in this case was not easily detectable. The basement appliances that the technician relit were in the northwest corner, and the defective gas pipe coupling was in the southeast corner. The basement staircase divided the room such that a person standing near the appliances could not see the area of the defective piping. Plaintiffs did not ask or

give permission to defendant's technician to enter the area of the defect, and therefore plaintiffs may not argue that the technician was negligent for failing to inspect the pipes there.

In fact, defendant had less reason to know of the risk of a gas leak than did the gas company in Clare, where it was determined that the gas company had neither actual nor constructive knowledge of the risk. In Clare, the natural gas delivered to the building was odorless, and the rusty leaking pipes were concealed under the floorboards. However, the problem was manifested by the plaintiff's complaints of headaches and irritation of her eyes and respiratory organs. Thorough investigations of the gas company's meter and exterior pipes disclosed no leak. The Clare court concluded that the gas company had no duty to inspect the customer's pipes because the company reasonably believed that the odor was from burned gas fumes, not leaking unburned gas.

In this case, defendant's technician had no constructive notice of any risk of a dangerous condition. The technician was summoned to repair a stuck gas meter, while the gas company in Clare was summoned to remedy an actual leak. Here, the technician was not asked to inspect for a possible gas leak or defective piping as the gas company in Clare had been. Similarly, the initiation of gas service gave defendant no constructive knowledge of any risk of a future gas leak or explosion, because the contact with the gas company did not involve a problem with the service. No technician had reason to know of any risk of a leak at plaintiffs' residence.

The service calls to the adjacent apartment at 2023 Eggleston gave defendants no constructive knowledge of any risk of a future gas leak or explosion. In May 1999, Sommers alerted defendant to an odor from her gas range, and the gas service to the appliance was sealed because of the risk of a leak. Plaintiffs alleged that the two apartments were mirror images and were piped for gas identically and, therefore, defendant knew or should have known that the gas range connection in

plaintiffs' unit presented the same risk. However, nothing suggests that defendant was aware of the similarity between the units, and plaintiffs never complained of an odor as their neighbor had done.

Two months after the meter replacement at 2025 Eggleston, Sommers reported poor gas pressure at 2023 Eggleston, and defendant replaced her meter as well. Nothing from the service call for a frozen meter at the residence next door would have alerted defendant to a risk of a gas leak in plaintiffs' basement. That service call did not give defendant actual or constructive notice of the need to inspect or to warn plaintiffs of a risk.

In Adams, the odorant added by the gas company caused the corrosion of a brazed brass connector between the customer's kitchen range and the internal hard pipe gas source. Adams, 211 Ill. 2d at 37-38. The corrosion caused the connector to leak and led to an explosion that killed the resident. The record showed that the gas company knew of the risk of corrosion to brass brazed connectors exposed to the natural gas odorant. The notice was in the form of internal company reports, letters from the American Gas Association to the company, and other explosions linked to failed brass connectors in the company's service area. Adams, 211 Ill. 2d at 39-41. In fact, the gas company told officials of a local municipality that it was aware of the connector hazard and would instruct its service and construction personnel to alert customers to the need to replace the connectors. Adams, 211 Ill. 2d at 41. The trial court granted the gas company summary judgment on the ground that, because the connector belonged to the decedent rather than the company, the company did not owe the decedent a legal duty to warn her that her connector was potentially hazardous. Adams, 211 Ill. 2d at 42.

On appeal, the supreme court considered the novel issue of whether a gas company owes a duty to warn its customer of the possible deterioration of the customer's fixtures when the fixtures

are damaged, in part, due to the gas product itself. Adams, 211 Ill. 2d at 50. The Adams court ruled that the gas company's knowledge of a leak or defect that would trigger such a duty may be actual or constructive. Adams, 211 Ill. 2d at 49.

The supreme court concluded that, "while no issue exists in [Adams] regarding a duty to inspect every connector, we agree with the following from Halliburton[ v. Public Service Co. of Colorado, 804 P.2d 213 (Colo. App. 1990)]: 'When a party can reasonably foresee that its product will be used as an integral component of a defective and unreasonably dangerous product, there is a duty upon that party to undertake corrective action to alleviate, if possible, the hazard.' " Adams, 211 Ill. 2d at 53, quoting Halliburton, 804 P.2d at 216. The duty is simply to use reasonable care in dealing with the hazard, which includes a duty to warn. Adams, 211 Ill. 2d at 53.

The court ruled that the gas company owed the decedent the duty to warn of the connector hazard. There was no dispute that the company had actual knowledge of the danger that sulfides in the odorant would corrode the brazed connectors, ultimately causing the connectors to leak gas. The defect meant that the connectors were certain to fail, the only issue was when. Adams, 211 Ill. 2d at 54. The court stated that "[b]ased on its superior knowledge and the fact that it helped to create the dangerous condition, we hold that [the gas company] owed a common law duty of reasonable care with respect to the brazed connectors." Adams, 211 Ill. 2d at 54. The court expressed no opinion as to whether the company had breached that duty. Adams, 211 Ill. 2d at 54.

Plaintiffs and defendant dispute the meaning of Adams. Defendant argues that Adams establishes two requirements for an exception to a gas company's right to assume the absence of a defect in customer-owned piping and fixtures: (1) the gas company has "superior knowledge" of the danger and (2) the gas company had a role in creating the dangerous condition. Plaintiffs argue that

superior knowledge is the only requirement and that in <u>Adams</u> the creation of the danger was merely the mechanism by which the gas company learned of the danger. We agree with defendant that plaintiffs' interpretation contradicts the unambiguous language used in <u>Adams</u>. See <u>Adams</u>, 211 Ill. 2d at 53 ("Since the gas companies [in <u>Halliburton</u> and <u>Lemke v. Metropolitan Utilities District</u>, 243 Neb. 633, 502 N.W.2d 80 (1993),] helped create the danger and had superior knowledge of the hazard, they owed a responsibility to their customers with respect to that danger").

When viewing the pleadings, affidavits, depositions, and admissions on file in the light most favorable to plaintiffs, we conclude that there is no genuine issue of material fact and that defendant is entitled to a judgment as a matter of law. See 735 ILCS 5/2--1005(c) (West 2008); <u>Klitzka</u>, 348 Ill. App. 3d at 597. Defendant had neither actual nor constructive knowledge of the defect. Dray, defendant's technician, visited the residence only once, 17 months before the explosion, and he entered the basement only to relight the pilot lights. Jarl built the residence, Warren Plumbing Company installed the gas piping, plaintiffs lived there more than a year, and Stefanie noticed a gas smell on the night before the explosion but did not notify defendant. Defendant had no notice of the defective installation of the gas piping or of any gas leak, and defendant had no responsibility for creating the dangerous condition that caused the explosion.

The gas company in <u>Adams</u> had "superior knowledge" of the risk because consumers were not in a position to be aware of the danger without adequate warnings and the danger was not one normally associated with the connector. The connector that caused the explosion in <u>Adams</u> was inherently defective, the use of the defective connector was not uncommon, and the gas company knew the risk and told its installers and service technicians to notify customers with whom they came in contact. Here, the gas piping used in plaintiffs' residence was installed incorrectly, but there is no

evidence that the materials were inherently defective like the connector in <u>Adams</u>. Also, the negligent installation was isolated to the duplex, and defendant had no reason to know of the risk.

For the preceding reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

BOWMAN and HUDSON, JJ., concur.