2019 IL App (2d) 190042-U
No. 2-19-0042
Order filed November 4, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| GUY MAYCHSZAK and FAUN MAYCHSZAK, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 15-L-259 |
| DIONISIO BROWN; LUZ BROWN; CASA VILLA, INC.; TRINITY CONTAINERS, LLC; WOODY, INC., d/b/a Woody True Value Hardware; TRUE VALUE COMPANY; NORTHERN PARTNERS COOPERATIVE; AMERIGAS PROPANE, INC.; AMERIGAS, INC.; FERRELLGAS, INC.; and FERRELL NORTH AMERICA, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |
| (Woody, Inc., d/b/a Woody True Value Hardware, Defendant-Appellee.) | ) ) ) ) | Honorable Lisa R. Fabiano Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justice McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Plaintiffs did not show genuine issues of material fact whether the propane tank regulator or the content of the propane tank warnings proximately caused the explosion. Moreover, defendant, Woody, Inc., did not have a duty to inspect the

homeowner's gas pipes. Therefore, we affirmed the trial court's grant of summary judgment.

¶ 2    Plaintiffs, Guy Maychszak and Faun Maychszak, appeal from the trial court's grant of summary judgment in favor of defendant, Woody, Inc., d/b/a Woody True Value Hardware (Woody). Plaintiffs' complaint arose from the explosion of Dionisio and Luz Brown's (the Browns) mobile home on October 13, 2013. On that day, Guy was dispatched to investigate the smell of propane gas. After Guy identified the smell as coming from the Browns' home, he shut off the flow of propane gas to their home. When Guy attempted to leave the area around the Browns' home, an explosion occurred. He was thrown to the ground and sustained physical injuries.

¶ 3    Plaintiffs sued several parties, including Woody, alleging multiple counts of negligence and loss of consortium. After the court granted Woody's motion for summary judgment on December 19, 2018, it found no just reason to delay an appeal pursuant to Illinois Supreme Court Rule 304(a) (eff. March 8, 2016). We affirm.

¶ 4                                    I. BACKGROUND

¶ 5    On August 29, 2015, plaintiffs filed their complaint against Woody and other named defendants, alleging in relevant part as follows. The Browns owned a mobile home (also referred to herein as a trailer) located in Sublette, Illinois, and they were members of the Woodhaven Lake Association (Woodhaven). Woody was a registered Illinois corporation engaged in the business of servicing propane tanks, which included refilling propane tanks at Woodhaven properties. Prior to October 13, 2013, Woody had serviced the Browns' propane tank. On October 13, 2013, Guy was dispatched to the Browns' home in response to complaints of the smell of propane gas. Seconds after he turned the Browns' propane tank valve to "off," an explosion occurred, injuring Guy.

¶ 6 Plaintiffs alleged that Woody was negligent in several ways, including that it failed to properly inspect the Browns' propane tank prior to October 13, 2013; failed to properly train its employees; failed to adequately warn its customers about the dangers of a propane leak and about how to maintain a functional propane gas detector; and failed to ensure its equipment was in proper working order.

¶ 7                            A. Summary Judgment Materials

¶ 8 Following discovery, Woody moved for summary judgment. We summarize the relevant facts from the affidavits, depositions, and other discovery materials as follows.

¶ 9                            1. The Browns' Home and Propane Tank

¶ 10 At the time of his deposition, Dionisio Brown was 83 years old and his wife, Luz Brown, had passed away. In the 1970s, he and his wife had bought property at Woodhaven, and they bought a trailer for the property around 1994. In 1994, the Browns also purchased a propane tank from Woody, and they entered into a Propane Gas Supply Agreement (Agreement). Per the Agreement, Woody was to "sell and deliver" propane to the Browns at their Woodhaven home. Woody was to periodically check the Browns' propane supply and to refill the tank when necessary.

¶ 11 Dionisio testified that Woody set up the propane tank adjacent to the trailer, and Woody connected it to the Browns' trailer. The propane tank supplied gas to the furnace and the stove. To the best of his knowledge, Woody never performed maintenance on the tank, but it did refill the tank. The Browns did not have any maintenance performed on their trailer prior to the explosion, including maintenance on the furnace.

¶ 12 The Browns only spent part of the year at Woodhaven, spending the rest of the year in Florida or the Philippines. When the Browns would leave the trailer for the winter, they typically

left the furnace on. In 2013, the Browns left the trailer for the winter on October 11, and they set the temperature to 50 degrees. The lights in the home were set to a timer, turning on in the morning and off in the evening.

¶ 13    Dionisio continued that, before leaving the trailer on October 11, he turned off the gas to the stove. To turn off the gas to the stove, he turned a knob on the piping located underneath the trailer. He checked the stove and observed that the pilot light was off, and he did not smell any gas coming from the stove.

¶ 14    Shawn Leffelman testified at his deposition as follows. At the time of the October 13 explosion, he was Woody's propane manager. The Browns had purchased their 120-pound "pig" propane tank from Woody, and Woody was their exclusive supplier of propane for tank refills. He was familiar with the Browns' propane agreement with Woody.

¶ 15    Leffelman agreed that Woody was in control of the Browns' propane tank and in control of the maintenance of the tank. Woody's training was done through an "IPGA[1] CETP Program, Certified Employee Training Program." Leffelman received training on how to install and fill propane tanks, and he was also trained to handle other hazardous materials. He had refilled the Browns' tank in the past, but he had not refilled it in 2013. Only he and Ed Reglin were qualified to refill propane tanks for Woody, although other employees could check the tanks. Leffelman taught Reglin how to refill tanks.

¶ 16    When a Woody employee checked a tank, "[a]ll they had to do was physically lift the lid, read the percentage gauge on the tank and return the lid to closed." The employee would then record the percent on a card and date the recording. When refilling a tank, Woody would refill the

---

[1] Illinois Propane Gas Association.

tank to 80% capacity, although up to 85% was safe. Eighty percent was industry standard, and it left room for gas expansion within the tank.

¶ 17    Prior to October 13, 2013, Woody last refilled the Browns' tank on April 25, 2013. On that day, Woody supplied 48 gallons of propane, filling the tank to 83% capacity. The ticket from April 25 contained safety warnings about propane, and the tickets were given to the lot owner if they were home at the time.

¶ 18    Woody employees did not usually perform a leak test during a refill. Unless the employee could see something that might be wrong with the tank, such as a cracked fitting, a leak test was not performed. A leak test would likely take 15 to 20 minutes. During a refill, Woody also checked the tank's paint for rust and checked whether the tank was sitting properly on its blocks.

¶ 19    Leffelman also checked the propane tank regulators. Only he and Reglin checked the regulators. As an ongoing process, Woody was replacing regulators. One reason to replace regulators was their age. Another reason was if the regulator was a single-stage regulator, it would be replaced with a dual-stage regulator. Leffelman explained that a single-stage regulator took the tank pressure to the working pressure of the trailer in one stage, whereas a two-stage regulator first had a high pressure side and then a low pressure side before the gas continued to the trailer. Regulators controlled how much propane gas went to the trailer, and if too much gas went to the trailer, it could create a hazardous condition.

¶ 20    The Browns had a single-stage regulator. Leffelman agreed that it needed to be changed to a dual-stage because of the regulator's life expectancy. Any regulator over 15 years old needed to be changed per the manufacturer's recommendation.

¶ 21    Woody included propane safety reminders in newsletters that Woodhaven mailed to its residents. The reminders stated that it was important for residents to monitor propane tanks, that

running out of gas can result in safety hazards, and that a leak check was required. Woody also provided propane safety handouts at their work counter for new property owners and customers, and the handouts had similar warnings to those printed on service tickets.

¶ 22    Edward Reglin also provided deposition testimony, as follows. His current title at Woody was LP tech, which meant he delivered gas to trailers and helped with gas hookups. Over his 10 years at Woody, he estimated he had refilled a couple of thousand propane tanks. When he installed tanks, he did not do any work inside the trailer. Trailers came with all gas lines hooked up to a main line.

¶ 23    Reglin conducted periodic checks of propane tanks at Woodhaven. When the weather turned colder beginning in September or October, he checked tanks more frequently, usually checking a tank every one to three weeks. To check a tank, he went to the lot and checked the tank's gas gauge. If the gauge showed the tank was below 40 percent capacity, he refilled it. The last time the Browns' tank was checked before the October 13, 2013, explosion was on September 14, 2013.

¶ 24    Reglin confirmed that a propane tank regulator controlled the amount of gas that goes from the tank to a trailer, so that too much gas did not go to the trailer. He agreed that the Browns' regulator needed to be changed to a two-stage regulator and that it had not been changed. A two-stage regulator was a safety feature for regulators, but it did not affect refilling a tank with the appropriate amount of gas. He thought the Browns' tank was in good shape when he last filled it in April 2013. The Browns' ticket from the April 2013 refill contained "Important Information on Propane Safety," such as what to do if you smell gas.

¶ 25    Woody bought and installed the regulators for propane tanks at Woodhaven. Reglin was involved in placing regulators on tanks. Regulators did not provide information about whether they

were functioning properly. "You just presume that it's working." If the regulator malfunctioned, Reglin said it was possible that it would pass too much gas along, but he had not seen that happen much. Another possibility upon the regulator's malfunction was that not enough gas would make it to the trailer.

¶ 26                                    2. The Explosion

¶ 27    Guy worked at Woodhaven as a public safety officer. As a public safety officer, he would respond to all types of calls, including calls for emergencies, medical issues, and fires. Prior to October 13, 2013, he had responded a few times to a gas leak at a trailer, and he had received basic training from Woodhaven in responding to gas leaks.

¶ 28    On October 13, 2013, Guy received a dispatch for a possible gas leak, and he located a hissing sound coming from the Browns' property. He detected a faint smell of gas, but he could not say whether the leak was coming from the tank or from the trailer. Based on his training, he turned off the valve to the propane tank. When he turned off the valve, the hissing noise stopped. He began to evacuate the area, and he was yelling at other people who had gathered in the area to move away from the trailer. Then, the explosion occurred.

¶ 29    Guy testified that he heard something right before the explosion, but it was difficult to describe. It sounded like a timer or an ignition—a strange noise. Everything happened fast. Right after he heard the sound, the air turned hot and the flames were "all over me." The trailer had exploded. Guy was struck by trailer debris, including "molten vinyl siding." His pants and shirt were on fire, and he rolled around on the ground to try to put the fire out. He did not remember everything that happened after that, but he did remember he was taken by ambulance to a hospital and then air-lifted to another facility. He received several skin grafts for his hands and arms.

¶ 30                                    3. Explosion Origins

¶ 31    Michael Poel was an arson investigator for the Illinois State Fire Marshal. Poel reviewed the explosion at the Brown's home and made a report. He believed a propane gas mixture fueled the explosion, and the likely source of the propane gas was a leak. He did not know where the leak originated. He was also unable to ascertain the specific area of fire origin because of the high level of damage to the home. In his opinion, there was no way to know exactly where the ignition source was located, and therefore his report stated the cause was undetermined. He believed there were a couple of possible ignition sources of the explosion. One main possibility was the lights that were on a timer. When they turned on, they may have created a spark. The other main possibility was a pilot light on the furnace.

¶ 32    Poel determined that the explosion began inside the trailer. The evidence for his determination was the debris field around the trailer, consisting of broken glass and physical pieces of the trailer in the yard. The propane tank itself did not explode. It was venting in the aftermath of the explosion, which is what the tank was supposed to do.

¶ 33    Tim Dunn was a plaintiffs' witness who proffered expert engineering opinions. In his affidavit, he averred to the following. He was familiar with the evidence in this case and rendered his opinions to a reasonable degree of engineering certainty. He opined that the explosion was proximately caused, in part, by the negligent acts and omissions of Woody. He believed the explosion was the result of a propane leak inside the Browns' mobile home, and any leak had to be the result of a failure in the propane system. The explosion required a fuel source, and the only fuel source at the time of the explosion was the 120 gallon tank.

¶ 34    Dunn averred that Woody knew the Browns' single-stage regulator was unsafe. Since 1995, propane systems have been installed with dual-stage regulators. The Browns' regulator was from 1990, and thus, by 2013, it was beyond the manufacturer's 15-year replacement

recommendation. He opined that Woody's failure to replace the regulator, which was in its control, contributed to the explosion. In the alternative, Dunn opined that Woody's failure to inform the Browns that their regulator needed to be replaced with a dual-stage regulator was dangerous and contributed to the explosion.

¶ 35    In addition, Dunn averred that Woody should have provided the Browns, as well as its other customers, with the propane safety tips and warnings recommended by the Propane Education & Research Council (PERC). He believed the propane safety tips that Woody supplied in the Woodhaven newsletters and its service tickets were deficient. They were deficient because they were not conspicuous warnings and were not sufficient to warn homeowners of the dangers of residential propane use. In particular, Woody breached its standard of care and contributed to the explosion by failing to provide the following warnings and recommendations: (1) Woodhaven residents should install propane gas detectors in their homes; (2) qualified service technicians should periodically inspect both the propane system and propane appliances; (3) propane appliances should be inspected annually and serviced as needed; (4) all appliances and connected piping should be inspected for code compliance and be serviced by a qualified technician; and (5) a leak check is required before turning on the gas.

¶ 36    Dunn also testified at his deposition as follows. He opined that the gas leak at the Browns' home could have occurred in one of two ways: as a result of substandard piping or as a result of increased gas pressure stemming from the single-stage regulator. Dunn explained that the piping under the Browns' home was made of copper, which was a soft metal. No industry standard prohibited the use of copper piping, but because it was not as rigid as steel piping, it needed sufficient support. He believed the Browns' piping was problematic in that it lacked support, had flared fittings, and the fittings were in concealed places.

¶ 37    He continued that handling the copper piping in the crawl space under the home, like Dionisio did, could "transfer the load itself" and "exercise damage to the piping above floor." That is, placing a load on the copper piping underneath the home could result in a leak at the flare seals on the piping inside the home. Thus, a gas leak may have occurred after Dionisio went under the home to turn the gas valve, which requires force to turn and would have placed increased stress on the unsupported piping. The fact that Dionisio "had been operating this home and operating the gas system for a number of years without incident and going underneath the home and handling the piping underneath the home, a leak above floor at the furnace or beside the furnace [was] the likely source of the gas." Dunn did not believe, however, that the furnace was defective.

¶ 38    Although Dunn thought it was "pretty likely" in this case that the gas leak related to the piping, he could not rule out an "overpressure situation" related to the regulator. The regulator was too damaged by the fire to know for sure. Therefore, Dunn agreed there was no direct evidence that the regulator malfunctioned.

¶ 39    Dunn maintained that Woody should have replaced the 23-year-old, single-stage regulator. The older a regulator was, the more likely it was to fail. Even if the regulator did not fail, Dunn believed it contributed to the explosion because it provided gas to an "otherwise aberrant and substandard" piping system.

¶ 40    Dunn opined that each time Woody delivered gas to the Browns since 2005, it should have noted not only that the regulator needed to be replaced but so too did the piping. Dunn agreed there was no standard that required Woody to check all the piping connections every time it refilled a propane tank. Nevertheless, he believed that Woody's training required inspection of the above ground propane system, which included the gas piping. Although Woody denied it did any of the piping under the Browns' home, Dunn noted it still had to connect the gas line from the tank to the

substandard piping. Dunn opined that Woody had the right and the obligation to refuse to hook up its propane tank to an unsafe system.

¶ 41    Dunn also testified about Woody's propane warnings. He could not say whether the Browns read any propane warnings or what, if anything, the Browns would have done differently had Woody provided additional warnings. Nevertheless, propane was dangerous, and the problem here was that Woody failed to provide customers sufficient warnings. Dunn conceded that Woody had a PERC pamphlet with safety information available at its store.

### B. Summary Judgment Order

¶ 42    On December 19, 2018, the trial court granted summary judgment for Woody. In its memorandum opinion, the court held that Woody was not negligent for (1) failing to replace the Browns' single-stage regulator; (2) failing to inspect the Browns' entire propane system; and (3) failing to provide adequate warnings.

¶ 43    Turning to the first allegation, the trial court held that Woody's failure to replace the single-stage regulator with a dual-stage regulator was not a proximate cause of the explosion. Here, it was "undisputed that there [was] no evidence that the single-stage regulator failed." Citing Dunn's testimony, the court explained there were only two ways in which the gas leak within the trailer could have occurred: a faulty single-state regulator or faulty copper piping. Plaintiffs had the burden to establish that it was more likely true than untrue that the explosion was caused by a faulty regulator, and two equally possible causes, without more, could not meet plaintiffs' burden. The court concluded that the jury would have to impermissibly speculate which of the two equally probable causes actually caused the explosion.

¶ 44    Next, the trial court held that Woody did not owe plaintiffs a duty to inspect the entire propane system. Generally, a gas supplier that did not install a customer's pipes was not

responsible for their condition or maintenance. While the court noted that an exception arises when the supplier was alerted to a gas leak, the court found no evidence that Woody was notified of a leak prior to the explosion.

¶ 45     Finally, the trial court held that Woody did not fail to provide adequate warnings. The court stated that because plaintiffs alleged that the content of the warnings were inadequate, they had to show that the Browns actually read the warnings. However, there was no evidence presented that the Browns ever read any warnings. Moreover, there was no evidence that had the Browns read the warnings, they would have acted differently. Thus, the court concluded that any failure to provide adequate warnings could not be the proximate cause of the explosion.

¶ 46     Plaintiffs timely appealed.

¶ 47                                    II. ANALYSIS

¶ 48     We review an order granting summary judgment *de novo*. *First Midwest Bank v. Cobo*, 2018 IL 123038, ¶ 16. A trial court should grant summary judgment if the pleadings, depositions, admissions, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). On a motion for summary judgment, the court should construe the record strictly against the movant and liberally for the nonmovant. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. "Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied." *Id.*

¶ 49     To succeed in an action for negligence, a plaintiff must establish the following elements: (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the defendant's breach of duty proximately caused injury to the plaintiff. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22; see *Brettman v. M & G Truck Brokerage, Inc.*, 2019 IL App

(2d) 180236, ¶ 42 (noting the fourth element: damages). Whether a duty exists under a particular set of circumstances is a question of law for the court to decide. *Choate*, 2012 IL 112948, ¶ 22. Whether a defendant breached a duty and whether that breach proximately caused injury are factual questions for a jury to decide, so long as the record presents a genuine issue of material fact. *Stanphill v. Ortberg*, 2017 IL App (2d) 161086, ¶ 30.

¶ 50    On appeal, plaintiffs make three arguments that the trial court improperly granted summary judgment for Woody: (1) the trial court erred in finding that the regulator could not have proximately caused the explosion; (2) the trial court erred in finding that Woody did not owe plaintiffs a duty to refuse or discontinue propane service; and (3) there was a genuine issue of material fact whether Woody provided plaintiffs with inadequate warnings. We address their arguments in turn.

¶ 51                               A. Duty of Care

¶ 52    Plaintiffs argue that Woody owed them a duty of care based on the outdated regulator and unsafe piping. Plaintiffs assert that Woody had a duty to: take the Browns' propane tank out of service until the regulator could be replaced; refuse to hook up the tank to an unsafe piping system; and, at a minimum, warn the Browns that their piping system was substandard and their regulator needed to be replaced.

¶ 53    Plaintiffs acknowledge the general rule in Illinois that, where a gas company does not install, own, and control the pipes or fixtures on a customer's premises, it is not responsible for their condition and maintenance. They argue, however, that an exception to the general rule applies in this case. Citing *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32 (2004), and *Clare v. Bond County Gas Co.*, 356 Ill. 241 (1934), plaintiffs argue a gas company can be held liable for defects

in a customer's pipes that it does not own or control if the gas company has knowledge of the defect.

¶ 54     Turning to the facts of this case, plaintiffs argue that Woody connected the propane tank to the Browns' copper gas line underneath their trailer. Although Woody only hooked up the gas to one line, plaintiffs cite Dunn's testimony that if a Woody employee saw unsafe piping under the trailer, he had an obligation not to connect the propane tank to the pipes. Moreover, Dunn believed that every time gas was delivered to the Browns since 2005, Woody should have noted the piping under the home needed to be changed.

¶ 55     Woody responds that Dunn's testimony is insufficient for plaintiffs to survive summary judgment. Woody cites Dunn's testimony where he admitted that no industry standard prevented the use of copper piping for the Browns' trailer. Thus, Woody argues that even if one of its employees had seen copper piping when he hooked up the propane tank to the Browns' piping, Woody was not on notice for a defective or unsafe piping system.

¶ 56     Woody also argues that plaintiffs had no evidence that the copper piping was unsafe, aberrant, or substandard. Woody argues that Dunn lacked personal knowledge of the copper piping because he never inspected the piping or its fittings, and that he lacked knowledge whether the copper piping was in place when Woody hooked up the propane tank. Woody cites Dunn's testimony that at some point in time the Browns' piping was changed from steel to copper, but he did not know when it was changed or by whom.

¶ 57     We hold that Woody did not have a common law duty of care to inspect the Browns' piping in and under their home. Illinois law has long been settled that, where a gas company does not install, own, and control a customer's piping and fixtures, it is not responsible for their maintenance. *Clare*, 356 Ill. at 244; see *Turner v. Northern Illinois Gas Co.*, 401 Ill. App. 3d 698,

707 (2010) ("*Clare* continues to accord with our understanding of the common-law rule."). Because a gas company is not responsible for its customer's pipes or fixtures, it is not liable for injuries caused by a leak therein. *Clare*, 356 Ill. at 244. Our supreme court has further explained that a gas company has the right to assume that a customer's interior system of pipes and fittings is sufficiently secure to safely receive gas. *Adams*, 211 Ill. 2d at 47-48. This is because "a person's duty can extend no further than the person's right, power, and authority to implement it," and gas company employees do not have the right to enter a customer's premises to inspect pipes and fixtures unless they have a license or the owner's permission. *Id.* at 47.

¶ 58    Nevertheless, where a gas company has knowledge that gas is escaping in a building occupied by its customers, that company has a duty to shut off the gas supply until the necessary repairs are made, even if the defective piping is not owned or controlled by the company. *Clare*, 356 Ill. at 243-44. This exception to the general rule applies "not only to actual gas leaks, but also to defects." *Adams*, 211 Ill. 2d at 50. Thus, a company is responsible for a customer's pipes if it has knowledge of a defect in the pipes. *Id.* Both actual and constructive knowledge can support a gas company's duty. *Id.* at 49. A company's knowledge is "sufficient if the gas company received facts which would have made the defects known to an ordinary prudent person." *Id.*

¶ 59    The record is clear that Woody did not install, own, or control the Browns' piping. It also did not have any actual knowledge of a gas leak prior to the October 13, 2013, explosion. Rather, plaintiffs' argument that Woody owed a duty to maintain the Browns' piping rests on whether Woody had sufficient knowledge of defects in the piping.

¶ 60    Here, plaintiffs cannot establish that Woody had sufficient knowledge of a defect in the Brown's piping. The alleged defect in the Brown's piping was the use of unsupported copper piping. On the one hand, Dunn testified that copper is a soft metal, and therefore copper piping

required more support than steel piping. On the other hand, Dunn also testified that copper was not prohibited in piping. No industry standard prevented the use of copper piping. Thus, the use of copper alone did not put Woody on notice for a piping defect.

¶ 61    In addition, the record does not contain facts demonstrating that Woody saw or should have seen a dangerous lack of piping support when it installed the propane tank. *Cf. Turner*, 401 Ill. App. 3d at 709 (there was no duty to inspect or warn where the defect was not easily detectable). The copper piping was located beneath the Browns' trailer, and the record cannot establish the piping was readily visible. Dunn testified that the piping was problematic for several reasons, including not only that it lacked support but also that much of it was located in *concealed places*. Without more, the general rule applies that a gas company may assume a customer's pipes and fittings are sufficiently secure to receive gas. *Adams*, 211 Ill. 2d at 47-48.

¶ 62    Plaintiffs cite two cases in support of their position, but the facts of both cases are distinguishable from the facts of this case. In *Firestone v. R. H. Lincoln, Inc.*, 23 Ill. App. 3d 320, 323 (1974), the defendant gas company received a complaint of the smell of gas five months prior to the explosion that caused the plaintiffs' injuries. In response to the complaint of gas, the defendant inspected the premises, including the gas supply line. *Id.* While the inspector did not find a leak, he found that the gas supply line contained an improper pipe fitting. *Id.* Plaintiffs presented evidence that, as a result of the improper fitting, piping threads in the gas line were rusted and deteriorated and that there was debris in the line as a result of the deterioration. *Id.* The defendant did not warn the plaintiffs about the improper fitting *Id.* In contrast to the defendant in *Firestone*, Woody did not receive a prior complaint and did not inspect the Browns' premises. Here, the only complaint of a gas leak occurred on the same day as the explosion, and Guy was injured while investigating the leak.

¶ 63    In *Oliver v. Peoples Gas Light & Coke Co.*, 5 Ill. App. 3d 1093, 1096 (1972), the defendant gas company installed gas meters in the plaintiffs' basement. Years prior to the fire in plaintiffs' basement, one of the plaintiffs detected a gas leak in the basement, and the defendant located and repaired the leak by replacing the lead piping connections on one of the meters. *Id.* At the time of the fire, the other meter still had lead piping connections that the defendant had originally installed. *Id.* One of the issues in *Oliver* was whether the leak occurred in the defendant's lead piping or in piping belonging to the plaintiffs. *Id.* at 1097-98. Unlike the defendant in *Oliver*, Woody did not install the Browns' piping, and it was never called to service a gas leak in their piping.

¶ 64    Although we hold Woody did not have a duty to inspect the Browns' piping that was not visible, Woody did have a duty to inspect and maintain the regulator. The parties do not dispute that Woody bought and installed the single-stage regulator on the Browns' propane tank. Leffelman admitted Woody was in control of the tank and was responsible for its maintenance. When Woody inspected its propane tanks, it checked the regulators, and there is no dispute that the Browns' regulator needed to be replaced with a dual-stage regulator. In fact, Woody had an ongoing process of replacing old regulators like the Browns' regulator. Accordingly, Woody owed a common law duty to replace the regulator.

¶ 65    Nevertheless, we reject plaintiffs' argument that Woody's duty to replace the regulator extended to a common law duty to discontinue gas service until the old regulator was replaced. While the regulator was beyond the manufacturer's lifetime recommendation, there was no evidence the regulator was malfunctioning, leaking, or was otherwise defective. *Cf. Clare*, 356 Ill. at 243-44 (when a gas company has knowledge that gas is escaping in a building, it has a duty to shut off the gas until the necessary repairs are made). Absent an actual leak, malfunction, or defect, a discontinuation of gas service in this case would place a disproportionate burden on both the gas

company and its customers. See *Turner*, 401 Ill. App. 3d at 704-05 (to determine whether a duty exists, courts consider certain relevant factors, including the likelihood of an injury occurring and the magnitude of the burden of guarding against such injury). Customers rely on gas for basic functions, such as heating their homes and cooking their food. In other words, Woody did not have to discontinue gas service as a *necessary* precaution prior to replacing an old but functioning regulator. See *Dennison v Skelly Oil Co.*, 47 Ill. App. 3d 1054, 1067 (1977) (stating that, due to the dangerous nature of propane gas, the company had a duty to take all *reasonable* precautions to avoid injury (emphasis added)); see also *Adams*, 211 Ill. 2d at 45 (a gas company's degree of care to prevent a gas leak is proportional to the level of danger posed).

¶ 66                              B. Proximate Cause

¶ 67     Plaintiffs next argue that the trial court erred in finding they could not show the regulator proximately caused the explosion. They argue the issue was for the jury to decide and that Dunn's opinion would not require the jury to speculate. Specifically, plaintiffs contend that Dunn testified there were only two possible causes of the explosion—a faulty regulator or faulty piping—and both possibilities were under Woody's control. Plaintiffs compare the facts of this case to *Oliver* and *Brooke Inns, Inc. v. S & R Hi-Fi & TV*, 249 Ill. App. 3d 1064 (1993).

¶ 68     We disagree with plaintiffs' argument. Specifically, we disagree that Woody was in control of both the regulator and the Browns' piping. We have already held that Woody did not owe a duty to inspect and maintain the Browns' piping; Woody had a duty only to replace the regulator. If a piping defect caused the explosion, Woody would not be liable, absent knowledge of the defect. Therefore, to survive summary judgment, plaintiffs had to present sufficient evidence to find that the regulator failed and proximately caused the explosion. See *Tzakis v. Dominick's Finer Foods, Inc.*, 356 Ill. App. 3d 740, 746 (2005) (to avoid summary judgment in a negligence action, a

plaintiff must allege sufficient facts for the trier of fact to find the defendant was responsible for the proximate cause of the injury).

¶ 69    Here, plaintiffs did not present any direct evidence that the regulator failed. Rather, relying on Dunn's opinion, they argued that if the pipes did not leak, then the regulator must have failed. However, Dunn testified that a leak in the piping was "pretty likely," explaining that because Dionisio had been handling the piping underneath the home, a leak in the piping above the floor was the likely source of gas. Thus, while Dunn could not rule out whether the regulator failed, the likely cause of the explosion was the Browns' piping.[2]

¶ 70    The facts of this case are distinguishable from the facts of *Oliver* and *Brooke Inns.* In *Oliver*, the plaintiffs presented evidence at trial that the defendant gas company had installed gas meters with lead piping connections, that the use of lead connections was against suggested trade practice, and that the defendant was aware such lead connections had the propensity to leak gas. *Oliver*, 5 Ill. App. 3d at 1099. In fact, another meter with the same lead connections had leaked gas several months prior to the fire. *Id.* While the plaintiffs' expert could not specifically identify the origin of the gas leak—the leak could have occurred in the defendant's piping or in other piping belonging to the plaintiffs—the jury's verdict in favor of the plaintiffs was compatible with the evidence. *Id.* at 1098. In contrast to the evidence in *Oliver*, plaintiffs here have not alleged facts that show the regulator was at least as likely as the Browns' piping to be the cause of the gas leak. In *Oliver*, the circumstantial evidence pointed to defendant's piping as the cause—the piping was

_____

[2] Dunn also testified that, even if the regulator did not fail, it contributed to the explosion by supplying gas to a substandard piping system. We note, however, that a new regulator also would have provided gas to the same piping system.

substandard and similar piping had already leaked—whereas here, the evidence suggested that the Browns' piping, not Woody's regulator, was the likely source of the leak.

¶ 71    *Brooke Inns* is also distinguishable. There, a fire occurred in the plaintiffs' attic, and the evidence supported that the defendant had control over the attic and that the fire resulted from the defendant's negligent use of a drop light. *Brooke Inns, Inc.*, 249 Ill. App. 3d at 1077. The defendant had "exclusive possession and control of the premises and instrumentality that caused the fire" (*id.*), whereas here, Woody controlled the regulator but not the piping.

¶ 72    In sum, plaintiffs presented evidence of two alternative causes of the explosion: the piping, which was the likely cause but was not under Woody's control; or the regulator, which was under Woody's control but was a less likely cause. Under these facts, the court did not err when it found, as a matter of law, that the regulator was not the proximate cause of the explosion.

¶ 73                              C. Sufficiency of Warnings

¶ 74    Plaintiffs' final argument is that an issue of fact existed over whether Woody's propane safety warnings were adequate. They argue that Woody prevented the Browns from reading certain warnings by failing to provide several pertinent warnings. Plaintiffs argue that even if the Browns had read the warnings in this case, they would not have been warned to install a gas detector, to have qualified technicians inspect their propane systems and propane appliances, and to perform a leak check before turning the gas on. Plaintiffs compare Woody's warnings to those in *Adames v. Sheahan*, 378 Ill. App. 3d 502, 530 (2007), where the appellate court held the warnings were sufficient to create an issue of material fact.

¶ 75    Woody responds that it did not prevent the Browns from reading any warnings. Woody argues this case is dissimilar to the facts of *Adames* and instead falls squarely within the rule articulated in *Kane v. R.D. Werner Co.*, 275 Ill. App. 1035 (1995). That is, when a plaintiff alleges

the contents of the defendant's warnings are inadequate, as opposed to alleging the defendant prevented the plaintiff from reading the warnings, the failure to read the warnings is fatal to the plaintiff's claim.

¶ 76    We agree with Woody that the Browns' failure to read Woody's warnings is fatal to plaintiffs' argument. Illinois courts have distinguished between two theories of negligence for failure to warn. See *Elam v. Lincoln Electric Co.*, 362 Ill. App. 3d 884, 889 (2005). Under one theory, a plaintiff argues the warning labels were inadequate, in that a deficiency in the defendant's labels prevented the plaintiff from reading the warnings. *Id.* Under such a theory, a failure to read the warnings is not fatal to the claim. Under another theory, a plaintiff argues the contents of the warnings labels are inadequate. *Id.* When the theory of recovery is based on the inadequate contents of the warnings, the plaintiff has to show the warnings were actually read. *Id.* (citing *Kane*, 275 Ill. App. 3d at 1037).

¶ 77    Here, plaintiffs' theory is that the content of Woody warnings was inadequate. There is no dispute that Woody printed warnings on its service tickets, that it had PERC pamphlets with propane safety warnings available at its store, and that it included propane safety materials in Woodhaven newsletters mailed to residents. Plaintiffs rely on Dunn's opinion that Woody's warnings failed to include several additional warnings, but Dunn never testified that Woody should have provided warnings in a different manner—he offered only an insufficient conclusion that the warnings were not "conspicuous."

¶ 78    The facts of this case more closely align with the facts of *Kane* than *Adames*. In *Kane*, the plaintiff fell from a ladder and injured himself. *Kane*, 275 Ill. App. 3d at 1035. The plaintiff sued the ladder manufacturer, alleging it provided inadequate warnings. *Id.* The plaintiff submitted an affidavit from a professional engineer stating that the warning labels were inadequate for failure

to include four additional warnings. *Id.* at 1036. The plaintiff admitted he never actually read the warning labels attached to the ladder. *Id.* In affirming the grant of summary judgment for the defendant, the court reasoned that since the plaintiff failed to read the warning labels, any inadequacy in the contents of the warnings could not have proximately caused his injury. *Id.* at 1037. Likewise here, Dunn testified that Woody should have provided additional warnings, but he could not say whether the Browns read any of the warnings or whether the Browns would have acted differently had they read Woody's warnings.

¶ 79    In contrast, the expert witness in *Adames* offered his opinion not only on the adequacy of the warnings' contents but also on the adequacy of the warning labels. In *Adames*, a child shot another child with his parents' gun. *Adames*, 378 Ill. App. 3d at 505. The plaintiffs sued the gun's manufacturer, alleging a failure-to-warn claim. *Id.* 528. The *Adames* court held that the plaintiffs presented a question of fact sufficient to survive summary judgment on their failure-to-warn claim. *Id.* at 530. In explaining its decision, the court noted that the plaintiffs' expert testified that the gun's "chamber loaded" indicator was difficult to see and that the gun itself should have had a warning label on it. *Id.* at 529. Unlike the expert in *Adames*, Dunn did not opine that Woody should have provided warnings in a different manner and, if so, what that manner should be. Rather, he opined that Woody should have provided additional warnings.

¶ 80    Plaintiffs do not present any evidence establishing that the Browns read Woody's warnings. Dionisio claimed that he could not read English and that he and his wife never read any of the warnings on the propane tank. Therefore, the trial court did not err when it determined that plaintiffs failed to create a genuine issue of material fact whether the allegedly inadequate warnings proximately caused the explosion.

¶ 81                                III. CONCLUSION

¶ 82    For the reasons stated, we affirm the judgment of the Winnebago County circuit court. In addition, we deny plaintiffs' motion to strike the introduction to Woody's brief. To the extent the brief's introduction does not comply with the applicable court rules, we disregard the introduction.

¶ 83    Affirmed.